UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FELHAM ENTERPRISES (CAYMAN) LIMITED | CIVIL ACTION |
| VERSUS | NO.  02-3588 c/w<br>04-624 |
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON<br>COMPANIES, ZURICH AMERICAN INSURANCE CO.,<br>MARINE OFFICE OF AMERICA CORPORATION AND<br>TRINITY YACHTS, INC. | SECTION "N"  (4) |

## <u>ORDER AND REASONS</u>

This matter came on for trial on February 14, 2005, and concluded on March 3, 2005.  Upon completion of the transcription of the record, the parties submitted their post-trial proposed findings of fact and memoranda on May 2, 2005.  Jurisdiction over this claim exists pursuant to 28 U.S.C. § 1333(1).  Venue is undisputed.

The Court now rules on the issues presented at the trial.  Where factual statements are contained in the Court's analysis, they are so found by this Court to have been proven.  Likewise, where disputed testimony is indicated as accepted, it can be assumed that the Court found such testimony credible and reliable, and rejected testimony to the contrary.

# I.  BACKGROUND FACTS

In a nutshell, this case involves an insurance claim on a substantially-completed yacht which was damaged by fire on July 2, 2002.  Plaintiffs, Felham Enterprises (Cayman) Limited (hereafter referred to as "Felham") and Friede Goldman Halter, Inc. and Halter Marine Inc. (hereafter collectively referred to as "Halter") claim proceeds under certain marine insurance provided by Zurich American Insurance Company (hereafter referred to as "Zurich").  The July 2, 2002 fire aboard the M/Y ULYSSES (hereafter referred to as "ULYSSES"), a 192 foot Global Explorer Yacht, occurred as she lay afloat and moored to the dock on the Industrial Canal at Trinity Yachts, Inc. (hereafter referred to as "Trinity") in New Orleans, Louisiana.  All claims against all other parties have been settled.

# II.  ISSUES AND CONTENTIONS OF THE PARTIES

Felham and Halter allege coverage by Zurich of certain losses sustained in the above-referenced fire.  Suit was filed by Felham on December 4, 2002, in the Eastern District of Louisiana.[1]  Halter is in bankruptcy.[2]  Halter filed an adversary proceeding against Zurich in the Southern District of Mississippi Bankruptcy Court on July 1, 2003.[3]  Halter and Felham[4] also assert

---

1.   Originally named as defendants were Certain Underwriters at Lloyd's, London Companies, Zurich American Insurance Company, Continental Insurance Company (erroneously referred to as Marine Office of America Corporation) and Trinity Yachts, Inc.

2.   *See Friede Goldman Halter, Inc., et al v. Zurich American Ins. Co., et al,* No. 03-05340 (Bankr., S.D. Miss. 2003).

3.   Originally named as defendants by Halter were Zurich American Insurance Corporation, CNA Insurance Company d/b/a Marine Office of America Corporation, and Palmer & Cay of Georgia, LLC.

4.   This Court has previously held that, absent an assignment, Felham has no claim for bad faith penalties under Louisiana law.  (*See* December 6, 2004 and January 24, 2005 Orders and Reasons, Rec. Doc. Nos. 329 and 376.)

Louisiana state law claims for bad faith, pursuant to La. R.S. 22:1220 and 22:658, with respect to Zurich's handling of their claim.

For its part, Zurich has offered the following defenses, *inter alia,* urged at various times throughout these proceedings:  Zurich alleges it is not a "following" underwriter such that it is bound by the settlement previously reached herein with the "lead" London Underwriters.[5]  Thus, Zurich argues, it has the right to confer with the other underwriters, and reject/disavow any settlement reached by those entities, such that plaintiffs must proceed against Zurich pursuant to its own "policy", and subject to Zurich's own investigation and defense of their claim.  Zurich further contends that the ULYSSES was not a constructive total loss, but rather should be considered an "unrepaired damage" claim, considering the cost of repair and the residual value of the damaged hull.  In early August 2004, Zurich additionally urged, for the first time, that its coverage be voided pursuant to the *uberrimae fidei* and moral hazard doctrines, alleging specifically that the ULYSSES had stability problems such that it could not meet the Lloyd's classification requirements and would not be satisfactory to its owner; and thus the failure of Halter to report such problems to its insurers voided the policy at issue.[6]

The Court frames these issues as follows:

1.      As a threshold matter, was the Zurich coverage at issue herein voided pursuant to the *uberrimae fidei* and moral hazard doctrines, as alleged by Zurich?

---

5.  "London Underwriters" collectively refers to certain underwriters at Lloyd's and certain London insurance companies.

6.  Zurich first alerted the Court to these defenses by correspondence dated August 5, 2004.  After a status conference was held on August 6, 2004, Zurich filed a motion to continue trial on the basis of these defenses, on August 10, 2004.  (*See* Rec. Doc. No. 206.)

2.      If Zurich's coverage was not voided, is Zurich bound as a "following" underwriter to the settlement previously achieved by the "lead" London Underwriters?

3.      If not, is plaintiffs' claim for damage to the ULYSSES for a constructive total loss or, instead, "unrepaired damage?"

4.      Whether considered as constructive total loss or "unrepaired damage" claim, what is the amount of loss covered by Zurich?

5.      Did Zurich handle Halter's claim in bad faith pursuant to La. R.S. 22:1220 and 22:658?

### III.   FINDINGS OF FACT - THE INSURANCE AGREEMENT/COVERAGE

**A.      The Builder's Risk Insurance Program**

Halter was engaged in the shipbuilding industry at all relevant times, and had in place an annually renewing Marine Insurance Program, including a Builder's Risk section, which is the insurance coverage at issue in this case.

Zurich was a fifteen-percent (15%) participant in Halter's Marine Insurance Program for the Policy Period March 1, 2000 to October 1, 2000.  (*See* Exs. 74 and 162; *see also* Walter Daniel Lord test., Vol. VIII, pp. 44:10 – 45:7; Chief Claims Manager Keith Morley test., Vol. IX,  pp. 28:7 – 28:12, 29:18 – 30:2.[7])  The remaining 85% of the participation in Halter's Marine Insurance

---

7.   Robert Shepherd, who became Halter's Vice-President of Administration and Risk Management in September 2001, testified that the inception date of a construction project "is driven by the commencement of work." (Robert Shepherd test., p. 143:16 – 23.)  The inception date of the ULYSSES construction project, initially incorrectly reported as October 1, 2000, was actually August 24, 2000.

The applicable policy period was previously determined by the Court in pre-trial motion practice. (*See* February 4, 2005 Order and Reasons, Rec. Doc. No. 403.)  Based on Mr. Shepherd's testimony, and the reasons set forth by this Court in its previous Order, the Court's ruling is based on the policy period of March 1, 2000 to October 1, 2000.

Program for the Policy Period March 1, 2000 to October 1, 2000, was made up of the London Underwriters, which together provided 70% of participation in the Program, and Continental Insurance Company (MOAC), which provided the remaining 15% of the participation.

The Builder's Risk section of Halter's Marine Insurance Program includes the American Institute Builder's Risk Clauses (Feb. 8, 1979), which provide in pertinent part as follows:

> AGREED VALUE
>
> The vessel for so much as concerns the assured by agreement between the assured and the underwriters in this policy is and shall be valued at the completed contract price, plus the value of materials and equipment destined for the vessel but not included in such price.

(Ex. 6, p. 157.)  Zurich also refers the Court to the Builder's Risk Clauses further providing as follows:

> SUBJECT MATTER
>
> * * *
>
> In the event of any material change in the specifications or design of the Vessel from that originally represented to the Underwriters, such change is held covered provided (a) notice is given to Underwriters immediately following such change, and (b) any amended terms of cover and any additional premium required by the Underwriters are agreed to by the Assured.  If no amount is stated for such materials and equipment, underwriters shall have no liability for any loss, damage or expense thereto or in connection therewith and such materials and equipment shall not be deemed a part of the vessel.

(Ex. 6, p. 157)

## B.      The Builder's Risk Policy Limits

In addition to the separate Owner Furnished Equipment ("OFE") sublimit, the Builder's Risk coverage of Halter's Marine Insurance Program has policy limits of $25,000,000 for any one vessel under construction.  The Policy under which plaintiffs have sued Zurich (policy period March 1,

2000 to October 1, 2000) originally carried a separate sublimit for OFE (owner furnished equipment and materials destined for the vessel but not included in the contract price) of $2.5 million.  (Ex. 11, Cover Note Addendum 5, p. 3 of 3.)  The OFE sublimit applied only to owner furnished materials prior to installation aboard the vessel.  Owner furnished labor and owner furnished materials, once installed, were included in the $25 million limit for vessels under construction.  (Ex. 11, Lloyd's Marine Policy at Bates number 00138; Ex. 11, Cover Note Addendum 5; Ex. 11, Cover Note Addendum 62.)

Mr. Les Wilton, the senior claims adjuster who handled plaintiffs' claim on behalf of his Lloyd's syndicate and as the Lloyd's leader, testified that "the owner-furnished equipment became part of the insured value as the equipment was fitted to the ship."  (Les Wilson depo., p. 35:14 – 17.)  Mr. Shepherd testified it was contemplated that the owner would be doing work on the vessel that would not have fallen into the category of OFE *per se*.  (Shepherd test., Vol. VI, p. 219:21 – 24.)  According to Mr. Shepherd, there are two categories --- owner furnished equipment and ship construction work.  Mr. Shepherd further stated that:

> [I]f the owner goes on board and brings a bunch of tradesmen to polish mahogany beams or to install a special suite, the labor associated with that is not what would fall under OFE.  That would fall under your ship construction costs.  If you look under the builder's risk report that you referred me to [Ex. 28] Felham has two pieces, OFE and then ship construction costs.

(Shepherd test., Vol. VI, p. 220:4 – 14.)

The separate sublimit for Owner Furnished Materials "prior to installation" was later increased to $5,000,000 on Page 2 of Cover Note Addendum 62:

> It is hereby noted and agreed, effective 12th December, 2000, that the separate limit in respect of Owner Furnished Equipment is increased to US $5,000,000 and Underwriters agree to increase their pro rata lines accordingly.

(Ex. 11, Cover Note Addendum 62, p. 2 of 2).  Mr. Charles deCuir, Halter's Vice President of Administration and Risk Management, confirmed that the initial sublimit of $2,500,000 was increased to $5,000,000.  (deCuir test., Vol. VI, pp. 114:21 – 115:5.)  Mr. Robert Shepherd, who took over as Vice President for Mr. deCuir in September of 2001, testified that the policy had an endorsement that increased the limit for owner furnished equipment above $2.5 million.  (Shepherd test., Vol. VI, p. 214:7 – 13.)

## C.   The Construction Of The M/Y ULYSSES

The ULYSSES is owned by Felham, a Cayman Island limited liability company in the business of owning and operating the motor yachts of Mr. Graeme Hart, the company's sole shareholder and managing director.  Discussions for the construction of the ULYSSES began in June of 2000 when Mr. Hart first contacted John Dane, President of Trinity.  On August 8, 2000, Felham entered into a Global Explorer Agreement with Trinity in the amount of $12,000,000 for the construction of the ULYSSES.   Trinity simultaneously entered into a Yacht Construction Subcontract Agreement with Halter in the amount of $7,911,058.   (Ex. 2, Global Explorer Agreement; Ex. 3, Yacht Construction Subcontract Agreement).

Under the contracts, Halter Marine had the obligation to construct the hull, install the machinery, complete the rough carpentry, pipe work, electrical wiring and controls, and launch the vessel.  Trinity supplied the majority of the main machinery and provided support and project management services as well as engineering and design.  In accordance with the contract specifications, Felham would provide labor, materials and equipment for completion of the internal joiner work, outfitting and application of the entire hull yacht fairing and paint finish system, as well as additional owner furnished internal finishings, furnishings, and fittings. (Ex. 129(f), CTC Report

6, Executive Summary at p. 1; Dane test., Vol. VII, p. 18:18 – 22.)  According to Mr. Dane, there

was in effect a "three party" contract between Felham, Trinity and Halter to construct the ULYSSES.

Mr. Dane spent a considerable amount of time defining the scope of Halter's work and the

list of owner furnished items that would be provided.  (Dane test., Vol. VII, p. 18:18 – 22).  Mr.

Dane further testified there was a "whole section" in the specifications on owner furnished work,

illustrated at Contract Specification at page 9, "Owner Furnished Materials and Equipment."  The

contracts defined "OFE" to "mean items identified in the Specifications as Owner supplied or

furnished" and defined "Owner Installed" to "mean items identified in the Specifications as Owner

Supplied and Owner installed."  (Ex. 3, Yacht Construction Subcontract Agreement, Article XXIII,

p. 31; Ex. 1, Global Explorer Agreement, Article XXIII, p. 35).  Mr. Hart testified he had no specific

budget for the owner-furnished labor, materials, and equipment; but he anticipated that he would

spend in the range of $12,000,000, which when added to the $12,000,000 Trinity/Felham contract,

put total construction costs of the ULYSSES in the $24,000,000 range.

**D.     Halter's Value Reporting**

Builder's risk reports are intended to notify the brokers and the underwriters of the

commencement of work on a particular project and to advise them of the value of the work so that

premiums can be calculated.  (Charles deCuir test., Vol. VI., p. 42:1 – 6; Robert Shepherd test., Vol.

VI., pp. 124:25 – 125:6.)  A precise completed or final contract value cannot be accurately reported

at the inception of a vessel construction project – "it's impossible."  (Shepherd test., Vol. VI, pp.

125:25 – 126:8, 182:3 – 11, 185:18 – 21, 197:13 – 22.)  Accordingly, Halter's Policy provides that,

"[s]ubject matters insured [are] to be reported bi-monthly in arrears."  (Ex. 11, Tab 11.)  The Global

Explorer Agreement, the contract between Felham and Trinity, further provides that "Owner

[Felham] shall notify Contractor [Trinity] and Subcontractor [Halter] of any particular equipment, furnishings or other tangible personal property and their respective values." (Ex.1, p. 13; John Dane test., Vol. VII, pp. 133:17 – 134:3.)

Per the express wording of Halter's Policy Conditions clause, only the lead London Underwriters "agree" to increases in project value.  (Lord test., Vol. VIII, pp. 79:25 – 81:12; deCuir test., Vol. VI, pp. 98:15 – 99:13; Simon N. Fox depo., pp. 37:14 – 39:3.)  The lead London Underwriters agreed to all increases in the ULYSSES's value, as reported by Halter.  (Exs. 19 and 20.)

Initially, Halter only reported its contract value of $7,911,058 to its insurance brokers, which Halter says was a mistake.  (Ex. 22; deCuir test., Vol. VI, pp. 43:17 – 44:9, 66:3 – 5; Shepherd test., Vol. VI, pp. 127:19 – 128:9.)  Halter continued to report only its contract value of $7,911,058 through April 2002.  (Ex. 26; Shepherd test., Vol. VI, pp. 127:19 – 128:9.)

In early May 2002, Halter, however, discovered its reporting error.  (Shepherd test., Vol. VI, p. 128:3 – 24. )  Once this error was recognized, Halter immediately notified and began working with both its domestic and London brokers to correct it.  (Exs. 217, 48, 49 and 50; Shepherd test., Vol. VI, pp. 128:25 – 129:21.)  On May 10, 2002, roughly two months prior to the fire, Halter's domestic insurance broker reported a new provisional contract value of $17,700,000 for the ULYSSES, which included the $9,700,000 that Halter anticipated actually spending to complete its work on the vessel, to Halter's London insurance broker (and including $3 million of OFE).  (Ex. 50; Shepherd test., Vol. VI, pp. 128:25 – 131:10.)  The $9.7 million value, reported in Ex. 50, represents the estimated value that Halter believed it would invest into the ULYSSES through delivery.  (Shepherd test., Vol. VI, pp. 199:4 – 200:2.)

Mr. Walter Daniel Lord, the Zurich Assistant Vice President and Branch Manager of the Ocean Marine Department in Atlanta, testified he was aware of the fact that Halter had reported the amount that it had at risk, $9,700,000, to its then domestic broker, Willis of North America, in May 2002, and that premiums were charged on that amount. (Lord test., Vol. VIII, pp. 121:3 – 10, 123:19 – 21.) According to Mr. Shepherd and Zurich's witnesses, Zurich did not object to Halter's reported value of $9,700,000. (Shepherd test., Vol. VI. p. 134:15 – 21.) Halter's newly reported provisional contract value of $17,700,000 was further conveyed to lead London Underwriters prior to the fire. (Shepherd test., Vol. VI, pp. 208:15 – 209:1.)

After the fire and in accordance with the bi-monthly reporting requirement, Halter timely reported an increased provisional contract value of $19,932,016 for the whole ULYSSES in its June 2002 builder's risk report. (Ex. 27; Shepherd test., Vol. VI, p. 136:15 – 23; Fox depo., pp. 82:10 – 84:3.) No objection to Halter's June 2002 builder's risk report was received from either the lead London Underwriters or any other Underwriter. (Shepherd test., Vol. VI, p. 138:16 – 19.)

A final contract value of $25,488,432 ($19,714,456 "in value associated with the Ship Construction" and $5,773,976 "in Owner Furnished Equipment (OFE)") was also timely reported by Halter in its July 2002 builder's risk report for the ULYSSES. (Ex. 28; Shepherd test., Vol. VI, pp. 140:19 – 141:8; Fox depo., pp. 85:15 – 89:19.) No one from Zurich ever objected to Halter's July builder's risk report. (Morley test., Vol. I, pp. 123:19 – 124:2, 125:8 – 14, 127:7 – 128:8; Lord test., Vol. VIII, pp. 106:17 – 110:8.) The Court finds that Halter complied with its duty to report to Underwriters the value of the ULYSSES.

**E.      Halter Paid Premiums In Full For This Builder's Risk**

Halter's Minimum and Deposit premium (hereinafter "M&D") for the 1999 – 2000 policy

year was $400,000 (deCuir test., Vol. VI, p. 34:22 – 24; Fox depo., p 66:17 – 21), which was paid

in full at the inception of the policy term.  (Ex. 90; Lord test., Vol. VIII, p. 88:3 – 6; deCuir test.,

Vol. VI, pp. 34:25 – 35:1; Fox depo., p. 66:22 – 25; Patti A. Priser, of Palmer & Cay, depo., p. 42:6

– 8.)  The M&D premium for the 2000 – 2001 policy year was also paid by Halter.  (deCuir test.,

Vol. VI, p. 35:2 – 4; Fox depo., p. 67:1 – 13.)  Newman, Martin and Buchan, Halter's London

insurance broker, "never had a payment problem with the insured."  (Fox depo., p. 67:1 – 20.)

The record is clear that Zurich never complained to Halter or its domestic brokers that it was

not receiving premiums.  Also undisputed is that Zurich has never returned any portion of the M&D

premium that it received from Halter.  Indeed, Mr. Lord testified he is not aware of "any evidence"

to support Zurich's contention that there was not enough M&D to insure the full value of the

ULYSSES ($25,488,432) in the 1999 –2000 policy period.  (Lord test., Vol. VIII, p. 110:16 – 20.)

The Court therefore finds that Halter had fully paid the premium due on the value of the ULYSSES

at the time of the July 2, 2002 fire.

**F.      Endorsement 232 And Cover Note Addendum 90**

Newman, Martin and Buchan were Halter's London insurance brokers for Halter's Policy.

Mr. Daniel Whiteside is a Divisional Director of the Marine-Energy Claims Division at Newman,

Martin and Buchan and handled the ULYSSES claim.  The placing group at Newman, Martin and

Buchan handled the generation of all endorsements and addendums to Halter's Policy.  (Fox depo.,

pp. 39:4 – 20, 93:25 – 95:7; Daniel Whiteside depo., p. 52:18 – 21.)

Following Halter's determination in early May 2002 that the ULYSSES' value should have been properly reported as $14.7 million dollars, including the $9.7 million that Halter estimated that it would invest into the vessel (and not including OFE), Newman, Martin and Buchan generated Endorsement 232 for Halter's builder's risk coverage.  (Exs. 19 and 50; Shepherd test., Vol. VI, pp. 128:25 – 132:12.)  Endorsement 232 officially established three things:  (a)  it corrected the inception date of the ULYSSES project, which should have initially been reported as August 24, 2000, instead of October 1, 2000; (b) it corrected the policy terms from which all underwriters' premiums were drawn down; and (c) it increased the reported value of the ULYSSES to $14.7 million.

Endorsement 232 further reflects the calculation utilized by Newman, Martin and Buchan to determine the exact amount of additional premiums that were drawn down from Halter's M&D in the "1999/2000 Year" and paid to underwriters as a result of this value increase, as well as those premiums that should have been credited back to Halter's "2000/2001 Year" M&D balance.  (Ex. 19.)  Once this M&D premium re-calculation was completed, Halter still had a surplus M&D balance of $89,994 for the "1999/2000 Year" and $292,267 for the "2000/2001 Year."   (Ex. 19; Shepherd test., Vol. VI, p. 133:9 – 21.)

Cover Note Addendum 90, generated by Newman, Martin and Buchan to "trap", or memorialize, Endorsement 232 (Ex. 17;  Fox depo., pp. 93:25 – 95:7), was issued to Halter's domestic broker and became a part of the Halter policy. (Ex. 17; Fox depo., p. 94:7 – 25.)  Mr. Lord admitted that Zurich accepts all the terms and conditions of the London Marine Package Policy unless it objects.  Mr. Lord has never rejected any addendum or endorsement to Halter's Policy,

including Cover Note Addendum 90.  (Lord test., Vol. VIII, pp. 90:5 – 8, 117:5 – 8.)  The Court finds that Zurich received its full premium for the ULYSSES at the time of the July 2, 2002 fire.

**G.     Endorsement 233 And Cover Note Addendum 100**

Once the ULYSSES' final contract value of $25,488,432 was reported by Halter in its July 2002 builder's risk report, and agreed upon by the lead London Underwriters, Newman, Martin and Buchan generated Endorsement 233.  (Ex. 20; Fox depo., pp. 98:9 – 102:25.)  Endorsement 233 officially reported the "final contract value (FCV)" of the ULYSSES as $25,488,432 and memorialized the settlement that had been agreed to by London Underwriters.  (Ex. 20; Shepherd test., Vol. VI, pp. 141:24 – 142:18; Fox depo., pp. 99:4 – 102:25.)  Endorsement 233 further reflects the calculation utilized by Newman, Martin and Buchan to determine the exact amount of additional premiums that were drawn down from Halter's M&D in the "1999/2000 Year" and paid to the underwriters as a result of this value increase from $14.7 million.  (Ex. 20; Shepherd test., Vol. VI, pp. 142:25 – 143:7.)  Zurich received its share of the M&D premium based upon this new calculation.  (Lord test., Vol. VIII, p. 110:21 – 22.)

Cover Note Addendum 100 was then generated by Newman, Martin and Buchan to "trap" Endorsement 233.  (Ex. 18.)  Cover Note Addendum 100, which essentially restates the contents of Endorsement 233 verbatim, was issued to Halter's domestic broker and became a part of the policy. (Ex. 18.)  Mr. Lord testified he, on behalf of Zurich, did not object to Cover Note Addendum 100. (Lord test., Vol. VIII, p. 90:5 – 8.)  The Court therefore finds that Zurich received its full premium on the Final Contract Value of the ULYSSES.

IV.  **FINDINGS OF FACT, LAW AND ANALYSIS - THE *UBERRIMAE FIDEI*[8]/MORAL HAZARD DEFENSES AND VOIDING THE POLICY ISSUE**

As a threshold matter, Zurich contends that any coverage plaintiffs might enjoy as a result of Zurich's involvement has been voided.  Though Zurich did not contest coverage prior to the institution of these proceedings, it raised these defenses, based on the *"uberrimae fidei"* and "moral hazard" doctrines, late in these proceedings.  Of course, should the Court agree with Zurich, any coverage would be voided and Zurich would prevail without further consideration of other issues herein.

A.  **No Misrepresentations Were Made To Zurich**

In its motion to continue trial filed on August 11, 2004, Zurich asserted that the ULYSSES would not have met classification stability criteria.  According to Zurich's motion, supposed misrepresentations made by the insured, Halter, with respect to the ULYSSES' design and/or specifications rendered Zurich's 15% subscription to the policy void under the *uberrimae fidei* and/or moral hazard doctrines.

As a threshold matter, it was Trinity, not Halter, that was charged by contract with responsibility for having the vessel classed by Lloyd's Register.  In any event, Zurich failed to establish that Halter made any misrepresentation to it concerning stability, design, specification or classification of the Yacht.

As admitted by Mr. Morley, Zurich *never* sought *any* information that in any way related to the contract drawings or the design or specifications of the ULYSSES.  (Morley test., Vol. I, p. 103:7 – 10.)  Mr. Lord further stated that Zurich had never sought any information that in any way

---

8.  *"Uberrimae fidei"* is "[a] phrase used to express the perfect good faith, concealing nothing, with which a contract must be made."  *See* BLACK'S LAW DICTIONARY 1520 (6th ed. 1990).

related to the contract drawings or the design or specifications of *any vessel* ever constructed by Halter. (Lord test., Vol. VIII, pp. 104:23 – 105:13.) Consequently, Zurich never obtained a copy of the contract drawings or specifications for the ULYSSES. This was confirmed by Mr. deCuir and Mr. Shepherd. (deCuir test., Vol. VI, p. 38:7 – 15; Shepherd test., Vol. VI, p. 150:1 – 7.) Mr. Morley stated forthrightly that he personally never requested nor ever obtained a copy of the contract specifications, nor did he ever talk to Charles deCuir or Robert Shepherd about the builder's risk policy. Mr. Lord likewise admitted that he never spoke with either Mr. deCuir or Mr. Shepherd at any time regarding this claim or anything else. (Lord test., Vol. VIII, pp. 63:23 – 64:11.)

Mr. Lord further admitted that no one from Zurich has ever visited any shipyard operated by Halter, and Mr. Morley confirmed that he has never been to any shipyard operated by Halter in Louisiana, Mississippi, or Texas. Indeed, Mr. Lord ultimately admitted at trial that, "because [Zurich made] no inquiry or review of any contracts, drawings, spec[ifications], [and made] no visitation to the [yacht] yard,… Halter [could not have] made any misrepresentation about the yacht ULYSSES" (Lord test., Vol. VIII, pp.104:23 – 106:16.)

Notwithstanding that Zurich moved to continue the trial based on alleged stability-related defenses, Mr. Morley admitted that he was "not aware of anything in [his] policy anywhere" regarding stability. (Morley test., Vol. II, pp.64:21 – 65:17.) Mr. Morley admitted he had no understanding of how the ULYSSES' stability before the fire has anything to do with this case (Morley test., Vol. II, p. 318:16 – 20), and was unaware that stability could be used as a policy or coverage defense, as he stated, "I mean, I know it was a stability issue raised, but I didn't know . . . [that] we were going to decline the claim on that since we've already tendered payment." (Morley test., Vol. II, p. 318:6 – 15.) Mr. Morley also indicated that whether the ULYSSES could or could

not meet the stability criteria in July 2002, before it caught fire, has nothing to do with the agreed value provision of the policy.  (Morley test., Vol. II, pp. 320:24 – 321:20.)  Mr. Morley was unable to identify any Zurich policy provision that had anything to do with stability.  (Morley test., Vol. II, pp. 321:22 – 322:2.)

Although Mr. Morley could point to no provision in the policy that in any way related to stability or misrepresentations, Zurich asserted pre-trial that it can avoid liability under the Policy's so called "Held Covered" clause.  The clause on which Zurich's counsel relies provides:

> In the event of any material change in the specifications or design of the vessel from that which were originally represented to the underwriters, such change is held covered provided (a) notice is given to the underwriters immediately following such change, and (b) any amended terms of cover and any additional premium required by the underwriters are agreed to by the assured.

Zurich has failed to show that Halter made any material misrepresentations to Zurich either before or after the inception of the insurance contract.  Specifically, because Zurich has not shown that there were any original representations as to the specifications or design of the ULYSSES, Zurich cannot establish that there was any subsequent misrepresentation.  Even assuming representations were made to Zurich with respect to the specifications or design of the ULYSSES, Zurich failed to establish that any original representations were ever changed by Halter.  (Lord test., Vol. VIII, pp. 104:23 – 106:16.)  Furthermore, there were no material changes to the risk on the ULYSSES contract.  (Shepherd test., Vol. VI, pp.180:24 – 181:9.)

## B.   Zurich Failed To Establish That The ULYSSES Would Not Have Met Lloyd's Register's Stability Criteria

It was stipulated before trial that only Lloyd's Register could determine if the ULYSSES met its stability criteria.  (Stipulations on the Record, Vol. I, pp. 38:11 – 39: 4.)  Zurich failed to prove

that the ULYSSES would not have met those criteria and that Lloyd's would not have classed the vessel. Mr. J. Lorenzo Perez, the surveyor in charge of the New Orleans office for Lloyd's Register, testified that Lloyd's Register approved the preliminary trim and stability booklet for the ULYSSES. This approval was subject to approval of the final trim and stability booklet, which would be submitted after the inclining experiment. (J. Lorenzo Perez depo., p. 63:16 – 24.)

It is uncontested that the final inclining tests of the ULYSSES were not conducted prior to the fire, and the final stability information was not submitted to Lloyd's. Nor, significantly, were Halter/Trinity under any contractual or regulatory obligation to Lloyd's to complete the stability test at or prior to the stage of construction existing at the time of the fire. (Daniel L. Robsham test., Vol. II, p. 493:15-18.)

Testimony at trial also established that classification societies do not require that every vessel be indistinguishable, but rather allow the builder flexibility. The classification society has discretion to accept a design as compliant or as an alternative arrangement, and may also choose in a particular instance to waive a rule. It is not uncommon for Lloyd's to accept modifications to stability criteria or alternate arrangements, including fixed ballast and/or operating book restrictions or limitations. According to Mr. Perez, Lloyd's Register has never had any reservations or any concerns as to the stability of the ULYSSES either before or after the fire. (Perez depo., pp. 68:2 – 6, 74:11 – 15, 74:18 – 25.)

John Dane stated that, prior to the fire, he had absolutely no concerns with respect to whether the ULYSSES would meet Lloyd's Register's intact stability criteria. (Dane test., Vol. VII, p. 27:21– 25.) Trinity has never delivered a vessel which failed to meet classification requirements. In fact, John Dane, during his extensive career at Halter, Moss Point, Friede Goldman Halter, and Trinity,

has never delivered a vessel which failed to meet classification requirements. (Dane, Vol. VII, pp. 29:20 – 30:1.)  Graeme Hart similarly testified he was not aware of any stability problems during the construction of the ULYSSES.  Moreover, Graeme Hart was unaware of any alleged vessel weight increase issues prior to the casualty. (Graeme Hart test., Vol. III, p. 605:9 – 12.)  Nor is there any testimony or factual evidence of the alleged weight increases in the record.

The only testimony concerning the alleged "instability" of the vessel was provided by Zurich's expert, Mr. John Hartson Leary.  Mr. Leary, an expert naval architect, conceded that Lloyd's Register has the sole authority to determine whether the vessel would have met stability criteria.  Mr. Leary also conceded that Lloyd's does not make a determination of whether a vessel meets stability criteria until after it witnesses the final inclining experiment.  No final inclining experiment occurred on the ULYSSES.  (Leary test., Vol. XI, p. 63:13-23, 64:23-25.)

Mr. Leary testified that, when he advises his clients, such as a shipbuilder, he explores all economically feasible stabilizing options, including varying aspects of fixed ballast, before embarking on structural modifications.  He admitted that structural modifications are often not economically feasible.  In this instance, Mr. Leary did not explore all options, such as adding more than eleven tons of fixed ballast.  He only explored financially prohibitive structural modifications. (Leary test., Vol. XI, pp. 58:17 – 59:3.)  Mr. Leary conceded that adding fixed ballast is much cheaper than structural modifications.  He also conceded that changes to the vessel's trim and stability booklet are far cheaper than structural modifications.  (Leary test., Vol. XI, pp. 56:21 – 57:7.)  Mr. Leary did not and was not asked to analyze 33 tons, 44 tons, or 55 tons of fixed ballast. He could have evaluated the vessel with this amount of ballast had he been asked to do so.  (Leary test., Vol. XI, p. 60:1 – 6.)

Mr. Leary's analysis is insufficient for several reasons. First, Mr. Leary assumes that ballast must be limited to eleven tons; however, no practical reason has been articulated for that limitation. Second, the methodology that Mr. Leary applied to determine the appropriate free surface correction for the flume tank is flawed, because Mr. Leary apparently did not consider the correct shape of the flume tank in his analysis. (Dr. Kenneth W. Fisher test., Vol. XI, pp. 150:16 – 153:25.)

The Court also heard testimony offered by Dr. Kenneth W. Fisher, an expert in the field of naval architecture. The Court was impressed with Dr. Fisher's extensive knowledge of naval architecture and his attention to detail with regard to the analysis of the ULYSSES, specifically with regard to any discrepancies or modifications necessary for the vessel to achieve stability and/or meet Lloyd's stability criteria. Contrary to Mr. Leary's interpretation that a zero heel angle is the only full free surface correction, Lloyd's and the International Maritime Organization utilize three methods to correct the righting lever curve. Mr. Leary's analysis is inconsistent with Lloyd's Rules. (Fisher test., Vol. XI, pp. 155:17 – 159:3.) As a consequence of Mr. Leary's failure to properly consider free surface effects, his opinion considerably understates the amount of reserve stability available in the ULYSSES. In other words, Mr. Leary's improper methodology results in much less reserve stability and, accordingly, does not comply with the allowances afforded by the Lloyd's stability criteria. (Fisher test., Vol. XI, pp. 159:17 – 160:7.)

With the proper free surface correction and approximately 40-50 tons of ballast, the ULYSSES would have passed the Lloyd's Register criteria. Also, loading restrictions would have been given consideration. However, this would not have happened until after the final stability calculations, which would have been calculated after the final inclining test had the fire not occurred. (Fisher test., Vol. XI, p. 166:14 – 168:9.) The addition of 44 tons of ballast would have

only lowered the vessel three inches deeper in the water than the eleven tons of ballast initially thought appropriate for the vessel.  Three inches is not a significant increase and, in fact, was described by Dr. Fisher as being "no big deal."  (Fisher test,, Vol. XI, pp. 200:25 – 201:13.)  If 44 tons of fixed ballast had been added to the ULYSSES and the proper free surface correction for the flume tank was accounted for, as found by the Trinity engineers, then the ULYSSES would have met the Lloyd's Register criteria.  (Fisher test., Vol. XI, pp. 208:16 –  209:3, 213:9-22.)[9]

Mr. Leary himself indicated that he excluded several things that could have rectified the alleged stability issues and refused to consider whether more appropriate and available remedies would work.  Specifically, Mr. Leary did not analyze or consider whether more than approximately 11 tons of ballast would remedy the alleged stability issue.  (Leary test., Vol. XI, pp. 65:23 – 66:1.)

Mr. Leary's opinion that Lloyd's Register would not class the vessel is based upon a preliminary inclining experiment, not a final inclining experiment, and is therefore incomplete.  The builder's stability-related information associated with Lloyd's Register classification had neither been finalized nor submitted to Lloyd's Register for review before the fire.  The process was incomplete and there is nothing to establish as fact that the builder's final stability information had been or would have been rejected by Lloyd's.  Absent specific documentation, it is purely speculative that Lloyd's Register would have rejected the vessel because of stability concerns.

Moreover, the evidence established that, not only were fixed ballast and/or operating restrictions normal; but also that Mr. Hart had no concern with either.  Because of his wife's penchant for sea sickness, Mr. Hart wanted her to have the smoothest possible ride, which is derived

---

9.  Dr. Fisher's conclusion that the ULYSSES would have met Lloyd's Register stability criteria was bolstered by the analysis conducted by Phil Nuss and Darren Preston of Trinity's Engineering Department, which likewise established that the ULYSSES probably would have met stability criteria with the addition of forty-four tons of fixed ballast.

"from the size of the vessel and displacement of the vessel."  Thus, Mr. Hart wanted his yacht to be "as big as we could reasonably build at the time and as heavy as we could reasonably build at the time."

Consistent with that goal, the ULYSSES has four fin stabilizers on it, which is the most that can be installed.  (Hart test., Vol. III, pp. 575:17 – 576:2.)    The vessel also had a ballast ring, that is,  a tank around the yacht that allows the weight of fuel that is used during a voyage to be replaced with sea water.  The replacement weight holds the vessel steady and down in the water.  (Hart test., Vol. III, p. 575:8 – 16.)  Mr. Hart further testified that fixed ballast, which is quite common, actually is preferable to him because its added weight would make the vessel sit lower in the water.  (Hart test., Vol. III, p. 571:7 - 13.)  In fact, he has installed fixed ballast on previous vessels.  (Hart test., Vol. III, p. 574:14-20.)  Mr. Hart also had no problem with operating booklet restrictions or loading restrictions.  (Hart test., Vol. III, pp. 574:21 –  575:9.)

## C.    The Vessel Would Have Met Contract Specifications

Although Zurich failed to submit evidence that the ULYSSES would not have met Lloyd's stability criteria, Zurich asserted that the vessel's weight would have exceeded contractual weight requirements causing Trinity to breach its contractual obligations to Felham.  This argument is flawed in light of the actual contract wording, and was rejected by the testimony of both Mr. Dane and Mr. Hart.

Section F of the Global Explorer Agreement references a weight allowance (not a restriction) of 50,000 pounds for owner-furnished materials.  This allowance is a fluid number adjusted to various parts of the contract, including draft and speed.  (Dane test., Vol. VII, pp. 21:6 – 22:15.) Mr. Hart recognized that the Felham/Trinity Contract provides for a certain speed and certain draft after

adjusting for the weight that the owner puts on the vessel.   The adjustment provides for a recalculation of performance, the speed, and the draft.  (Hart test., Vol. III, p. 569:8 – 12.)  Mr. Hart testified that 50,000 pounds was a contractual benchmark, which allowed Trinity the flexibility to adjust its contractual obligations with respect to draft and speed in light of the weight that Felham placed on the vessel.   (Hart test., Vol. III, pp. 569:23 – 570:9.)   According to Mr. Hart, the contractual adjustment for owner-added weight was straightforward – as Felham increased the weight on the vessel, the contract allowed the vessel draft to increase.  Mr. Hart wanted the extra weight of the vessel in the water, as it provided a more stable yacht.  Further, as far as Mr. Hart was concerned, lowering the draft by 5 to 6 inches was negligible and barely noticeable.  (Hart test., Vol. III, pp. 570:19 – 571:16.)

Mr. Dane further testified that regardless of the contractual adjustments with regard to owner-furnished equipment weight allowances, Trinity was unconcerned about meeting draft, speed, or other contractual requirements in relation to delivery of the vessel to Felham.  (Dane test., Vol. VII, p. 23:13 – 18.)  Mr. Dane had no concerns as to whether Trinity could have delivered the vessel ULYSSES to Mr. Hart with respect to contractual draft, speed, or any other contractual requirements.  (Dane test., Vol. VII, p. 32:18 – 22.)  According to Mr. Hart, after the contractual adjustment for the weight placed on the ULYSSES by Felham, the contract would have been "quite satisfactory."  (Hart test., Vol. III, p. 569:19 – 22.)

**D.     The Policy Cannot Be Voided Under Either The Doctrine Of *Uberrimae Fidei* Or State Law**

This Court has previously held that Louisiana state law, La. R.S. 22:619, not the general maritime doctrine of *uberrimae fidei,* controls the issue of whether a marine insurance policy is void by reason of an insured's alleged misrepresentation and/or failure to disclose material facts during the application process.  *See Albany Ins. Co. v. Anh Thi Kieu,* 927 F.2d 882, 886-90 (5th Cir. 1991)

(applying Texas law); *North American Specialty Ins. Co. v. Parra,* 1996 WL 592744, *2-3 (E.D. La. 10/11/96) (Vance, J.) (applying Louisiana law); *Insurance Co. of North America v. West of England Shipowners Mut. Ins. Assn.,* 890 F. Supp. 1302, 1305-06 (E.D. La. 7/14/95) (Vance, J.) (same).  Given that the policy in question was first issued on October 1, 1997, and the alleged misrepresentations and/or failure to disclose by Halter regarding the vessel's stability did not occur until approximately three years later, the Court finds no justification for voiding the policy based on Halter's disclosures during the policy application process.

Louisiana statutory law applies only to alleged misrepresentations "made in the negotiation of an insurance contract."   In pertinent part, La. R.S. 22:619, entitled Warranties and Misrepresentations In Negotiation, provides:

> A.  Except as provided in subsection B of this section and R.S. 22:692, and R.S. 22:292.1, no oral or written misrepresentation or warranty *made in the negotiation of an insurance contract*, by the insured or in his behalf, shall be deemed material to defeat or void the contract or prevent it attaching, unless the misrepresentation of warranty is made *with the intention to deceive.*

La. R.S. 22:619 (emphasis added).

Contrary to Zurich's assertions that Halter allegedly misrepresented the original design or specifications of the ULYSSES prior to the formation of the insurance contract, there was no evidence at trial, either through exhibits or testimony, that Halter at any time made any representations to Zurich with respect to the stability of the ULYSSES either in the construction contracts, the contract drawings, or the contract specifications.  Zurich neither requested nor obtained the contract specifications for the ULYSSES.  Without an original representation as to the design of the ULYSSES with respect to stability, there could have been no subsequent misrepresentation made by Halter with respect to stability, and certainly no misrepresentation made

by Halter while negotiating the terms of the policy prior to the October 1, 1997 inception of the

policy, or the March 1, 2000 rewrite of the policy, or before commencement of construction of the

ULYSSES on August 24, 2000, which date controls the "attachment" of the ULYSSES project to

the March 1, 2000 to October 1, 2000 policy term.  Nor can Zurich claim any misrepresentation by

Halter or Trinity at any time prior to any of the relevant cover note addenda or endorsements, as

stability of the vessel had not been the subject of previous inquiry by Zurich.  Indeed, stability of

the vessel was not material to Zurich until shortly before it moved to continue this trial in August

2004.

**E.      The Policy Is Not Voided Under Any Theory Of Moral Hazard**

Moral hazard refers to the possibility that an insured party may deliberately put his property

at risk in order to obtain an insurance windfall.  *Hamilton v. United Health Care of Louisiana, Inc.*,

310 F.3d 385, 398 n. 7 (5th Cir. 2003).  In Louisiana, an increased moral hazard on the property

insured that occurs after the insurance policy is entered into has no effect on the policy.  W. Shelby

McKenzie and H. Alston Johnson, III, 15 LOUISIANA CIVIL LAW TREATISE INSURANCE LAW &

PRACTICE, § 216 (2d ed. 1996).  Additionally, under Louisiana law, moral hazard is only applicable

with respect to fire insurance policies.  La. R.S. 22:692.  Because the applicable section of the Halter

Marine Package Policy is not a fire insurance policy, but rather is builder's risk coverage, moral

hazard has no applicability to this suit.

Even so, with respect to fire insurance policies, the only way for an insurer to avoid liability

on its policy is to show that the insured breached a representation, warranty or condition contained

in the policy and that the breach existed at the time of the loss thereby increasing the moral hazard

under the policy.  La. R.S. 22:692.  Zurich has not shown that Halter breached any representation, warranty or condition of the policy.

On cross-examination, Mr. Morley could point to no provision of the policy that would be in any way affected by stability.  Nor did Zurich carry its burden of proving that the ULYSSES, at the time of the fire, would likely not have met Lloyd's Register stability criteria.  Although the final incline test had yet to be performed on the date of the fire, the Trim and Stability Booklet prepared by Trinity had received preliminary approval from Lloyd's Register.  Any stability concerns that might have been demonstrated on the final incline test could have been remedied with fixed ballast or loading restrictions, all of which were acceptable to Mr. Hart.

**F.      There Are No Warranties In The Policy Regarding Stability**

Although Mr. Morley could cite no policy provision that would allow Zurich to void its policy with respect to the stability of the ULYSSES, Zurich asserted, in pre-trial briefing, that the terms of a "held covered clause" are an express warranty.  The clause on which Zurich relies provides:

> In the event of any material change in the specifications or design of the vessel from that originally represented to the underwriters, such change is held covered provided (a) notice is given to the underwriters immediately following such change, and (b) any amended terms of cover and any additional premium required by the underwriters are agreed to by the assured.

Under this provision, in the event Halter failed to notify its underwriters of material changes in any "originally represented" specifications or design of the ULYSSES, the change would not be held covered unless underwriters were notified of the change and any additional premiums were paid.  As testified by Mr. Morley, whether or not the ULYSSES would meet Lloyd's Register stability criteria has nothing to do with this provision or any other provision of the policy.  Further,

Zurich failed to establish that any original representations with respect to the specifications or design of the ULYSSES were ever changed by Halter.  Plainly stated, because Zurich has not shown that Halter made any original representations as to the specifications or design of the ULYSSES, Zurich cannot establish that there was any subsequent misrepresentation and Zurich cannot void its 15% subscription in the Policy.

Because Zurich has failed to show that Halter made any misrepresentations, either before or after the negotiation of the insurance contract, and because Zurich has failed to show how the stability of the ULYSSES in any way relates to its builder's risk coverage or increased the moral hazard, Zurich's attempt to void the policy under the *uberrimae fidei* doctrine, under Louisiana law, or under a theory of moral hazard, are rejected.

## V.   FINDINGS OF FACT, LAW AND ANALYSIS - THE "LEAD/FOLLOW" ISSUE

Finding the coverage to be in effect at the time of the subject loss, the Court next turns to a determination whether Zurich was and is bound to follow the lead of the London Underwriters, specifically with regard to the leader's investigation, adjustment, and settlement of the plaintiffs' claims.  If Zurich is bound to the previously achieved settlement, then its liability to plaintiffs is fixed at 15% of that settlement.  The Court previously denied summary judgment on this issue (*See* August 4, 2004 and November 19, 2004 Order and Reasons, Rec. Doc. Nos. 199 and 308), finding determination of this issue to be fact-intensive such that it should be considered by trial on the merits, wherein conflicting testimony and documents could be placed in context and considered as a whole.  Accordingly, the Court makes the following factual findings and determinations with regard to Zurich's role in the subject coverage.

**A.     The Intent Regarding The Configuration Of The Marine Package Policy**

Mr. Charles deCuir set up and administered Halter Marine Group's insurance program from 1996 through its merger with Friede Goldman in 1999, at which time he became Senior Vice President of Risk Management and Contracts for Friede Goldman Halter, Inc.  (deCuir test., Vol. VI, pp.8:24 – 10:19.)  While at Halter, Mr. deCuir was solely responsible for the procurement of insurance, the administration of claims, the adding of insurance language and dealing with brokers. (deCuir test., Vol. VI, p. 10:20 – 23.)  Mr. deCuir remained employed in this capacity until his resignation from Halter in September 2001, in that he was solely responsible for the day-to-day administration of Halter's insurance program.  (deCuir test., Vol. VI, pp.10:24 – 11:6.)

The configuration and administration of Halter's Policy was based upon the model utilized by Trinity Marine Group, for whom Mr. deCuir began working in 1993, before a portion of that company was taken public as Halter Marine Group.  (deCuir test., Vol. VI, pp. 7:4 – 9:14.)  Mr. deCuir was placed in charge of Trinity Marine Group's "overall insurance programs" and contract administration.  (deCuir test., Vol. VI, p. 7:4 – 25.)  The Trinity Marine Group policy "was a package program with all the marine coverages under one package that was led by London, who had a 70% participation, then there was 30% that was domestic underwriting."  (deCuir test., Vol. VI, p. 7:7 – 14.)  The domestic underwriters who subscribed to the Trinity Marine Group policy were "followers" with regard "to [the] administration [of the policy], terms and conditions, claims management, claims handling, et cetera."   (deCuir test., Vol. VI, p. 8:5 – 23.)

Halter's specific intent, with respect to the subscription nature of its Marine Package Policy, "was to have multiple underwriters with strong security to enhance the program and, in addition, to

set it up as a subscription policy where you have a lead and following underwriters and that we [Halter] had a singular point of contact to transact business." (deCuir test., Vol. VI, pp. 17:12 – 19, 106:6 – 21.) The "singular point of contact" was to be London Underwriters. (deCuir test., Vol. VI, pp. 17:20 – 21, 50:10 – 22.) Halter's intent that the "singular point of contact" was to be London Underwriters is consistent with the language contained in Zurich's "Declarations" page for the March 1, 2000 through October 1, 2000 policy term, which states in pertinent part, "Subject to the following, per London's forms and endorsements." (Exs. 10 and 374, p.5; deCuir test., Vol. VI, pp. 21:11 – 22:8.)

Zurich's only testifying underwriter, Mr. Lord, was not involved with Halter's insurance program until March 1, 2000, has never met Mr. deCuir, and did not have any discussions with Halter's then insurance broker, Lambert Fenchurch, at the time of Zurich's initial subscription to Halter's Policy in 1997. (Lord test., Vol. VIII, pp. 81:17 – 83:12.) Mr. Lord never wrote any terms and conditions for Zurich's "policy." (Lord test., Vol. VIII, p. 89:12 – 17.) Mr. Lord admits that he has "never discussed the intent" behind Halter's Policy. (Lord test., Vol. VIII, p. 83:13 – 17.) Hence, Mr. deCuir's testimony regarding the intent behind Halter's Policy was unchallenged and uncontroverted, and supports the Court's conclusion that Zurich was obligated to follow the London lead, and to pay its 15% of the settlement by lead London Underwriters.

**B.      The Operative Policy Language**

Halter's Policy's  "Conditions" clause states:

> All terms, clauses, and conditions as per wording agreed by leading Company and Lloyd's Underwriter.

> It is agreed that any amendments and/or agreements and/or alterations and/or increases (not exceeding written line) or decreases in value, to be ***agreed by leading Company and Lloyd's Underwriter***.

(Ex. 11, Tab A, p. 00139.)(Emphasis added.)  This language designates Zurich as a follower of lead London Underwriters.

Although Zurich posits that it issued an enforceable separate "policy", the "policy" itself suggests that Zurich was a following Underwriter.  The certification attached to this Zurich "policy", produced in mid-to-late January 2004 and signed by Mr. Lord, states in pertinent part:

> 3.   Attached hereto is a true, correct and complete copy of the Zurich Policy representing its ***subscription*** of 15%, for itself and no other, severally and not jointly, and subject to all its terms and conditions, limits, limitations, and deductibles, to Halter Marine's Marine Package Policy of the period of 3/1/00 – 10/1/00 which Policy consists of 109 pages.

(Ex. 374.)(Emphasis added.)  According to Mr. Jeronimo, Zurich's "policy" was a "subscription policy."  (Lawrence Jeronimo depo., p. 31:17 – 22.)  Mr. Lord admitted that the distinction of being a subscriber could connote or indicate that Zurich was a following underwriter.  (Lord test., Vol. VIII, p. 51:18 – 22.)

To the extent that it is actually a part of Zurich's "policy," the Marine Program (Ex. 374) included within Zurich's "policy" states in pertinent part:

**CARRIER(S):**    70% (Leader):   72.340% Various London Insurance Companies

                                          27.660% Underwriters at Lloyd's

                      15% Zurich Insurance Company

                      15% Continental Insurance Company

                                          ***

-29-

**CONDITIONS APPLICABLE**

**TO ALL SECTIONS & AS**

**NOTED:**                              All terms, clauses, and conditions as per wording agreed by leading Company and Lloyd's Underwriter.

It is agreed that any amendments and/or agreements and/or alterations and/or increases (not exceeding written line) or decreases in value, to be agreed by leading Company and Lloyd's Underwriter.

Even Zurich's "Declarations" page,[10] included within its "policy", states in pertinent part:

Subject to the following:

Per London's Forms and Endorsements

American Institute Builder's Risk Clauses (Feb. 8, 1979)

This Policy is made and accepted subject to the foregoing provisions and stipulations and those hereinafter stated, which are hereby made a part of the Policy, together with such other provisions, stipulations and agreements as may be added hereto, as provided in this Policy.

(Ex. 10 and 374, p. 5.)

Viewed in light of the trial testimony and other evidence taken as a whole, there is no right of consultation language contained within the "Conditions" clause of Zurich's "policy" with respect to claims or anything else on this policy. The only entities that are extended the authority to make agreements under Zurich's "Conditions" clause are lead London Underwriters, *i.e.*, the "leading Company and Lloyd's Underwriter." (Lord test., Vol. VIII, pp. 79:17 – 81:12; deCuir test., Vol. VI, pp. 109:17 – 110:2; Fox. depo., pp. 37:14 – 39:3.)

_____

10.   This "Declarations" page is unsigned, and therefore unenforceable.

-30-

**C.      The Claims Process And Zurich's Practice Of Following The Lead London Underwriter**

Mr. deCuir and Mr. Shepherd were Halter's only two risk managers from 1996 through December 2003.  Mr. Shepherd replaced Mr. deCuir as Vice-President of Risk Management and Contract Administration from September 2001 through December 2003.  Based on the testimony of Messrs. deCuir and Shepherd, claims were typically handled in the following manner:  Halter prepared and submitted the claim to its domestic broker, who in turn submitted it to Halter's London broker, Newman, Martin and Buchan; the London broker communicated with the London underwriters, who made a decision on the claim and notified Halter's domestic and London brokers. In turn, the domestic broker advised Halter of the claims decision, and checks were then issued to Halter based upon the lead London underwriter's decision.  Halter had no history of failing to provide information or data, or  being uncooperative, with regard to past claims.

This is the first Halter claim where Zurich failed to pay its 15% portion of a claim agreed to by lead London Underwriters.[11]  (deCuir test., Vol. VI, p. 28:17 – 20; Shepherd test., Vol. VI, p. 123:12 – 15.)   Other than this claim, Zurich has never hired its own surveyors or lawyers on builder's risk claims.  (deCuir test., Vol. VI, p. 28:21 – 23; Shepherd test., Vol. VI, pp. 123:21 – 24, 124:9 – 11.)  Zurich never previously took the position with either Messrs. deCuir or Shepherd that it was not a following underwriter.  (deCuir test., Vol. VI, pp. 28:24 – 29:2; Shepherd test., Vol. VI, p. 123:16 – 19.)  Mr. Edward T. Brennan, who worked for Palmer & Cay, Halter's domestic insurance broker, and assisted in the handling of Halter's insurance claims, also does not recall any

---

11.   Even after the ULYSSES loss, Zurich also never failed to follow lead London Underwriter's decision with respect to either claims settlement or quantum of a builder's risk claim or "to pay its 15% portion of claim as agreed by London", according to Mr. Shepherd.  (Shepherd test., Vol. VI, pp. 122:17 – 25, 124:12 – 15.)

instance where Zurich objected to any compromise or settlement agreed by the lead London Underwriters and did not follow the London lead.  (Edward T. Brennan depo., pp. 106:6 – 10, 108:18 – 109:1, 109:18 – 21, 109:25 – 110:10, 110:16 – 111:3.)

Mr. deCuir does not recall Zurich, or any other domestic underwriter, ever issuing "their opinion or their number on a claim" throughout his administration of Halter's policy.  (deCuir test., Vol. VI, p. 28:3 – 7.)  Mr. deCuir does not recall Zurich ever indicating that it did not have to go along with a decision made by London on an increase in value of a project throughout his administration of Halter's policy (deCuir test., Vol. VI, p. 30:12 – 15.)  Nor did Zurich ever tell Mr. deCuir, throughout his administration of Halter's policy, or Halter's domestic broker, that the Conditions Clause of Halter's policy (¶ 103) somehow did not apply to it.  (deCuir test., Vol. VI, p. 29:8 – 11.)  Importantly, Zurich never issued a reservation of rights letter to Mr. deCuir throughout his administration of Halter's policy, with respect to a claim that Halter was making.  (deCuir test., Vol. VI, p. 29:3 – 7.)  Likewise, Mr. Lord admitted he has never rejected an addendum or endorsement to Halter's policy, including Cover Note Addendum 90.  (Lord test., Vol. VIII, pp. 90:5 – 8, 117:5 – 8.)

Mr. Brennan also believed that Zurich subscribed to Halter's policy as a "following underwriter."  (Brennan depo., pp. 45:22 – 46:2, 48:5 – 11, 64:12 – 65:9, 65:13 – 25.)  Mr. Brennan based his conclusion that Zurich was a "following underwriter" on the fact that Zurich did not issue a policy and the verbiage contained in the Newman, Martin and Buchan Cover Note.  (Ex. 12; Brennan depo., pp. 104:8 – 105:7, 105:10 – 25.)

**D.     Zurich Repeatedly Refers To Itself As A "Following" Underwriter, And Acts As Such.**

Zurich admits that "[o]ur coverage is under the builder's risk coverage (Section I) of this policy and we have a 15% following line interest…" (Ex. 254; Lord test., Vol. VIII, p. 113:6 – 14.) When Zurich officially requested Rivers and Gulf to answer six limited questions for it on July 12, 2002, it did so under the premise that it was a "following underwriter." (Ex. 230; Morley test., Vol. II, pp. 268:23 – 269:13.) Zurich's July 12, 2002 "Request for Survey" did not include any instructions to perform a nature, cause and extent damage survey, repair estimate or determine the value of the hull, pre or post loss. (Morley test., Vol. II, pp. 266:25 – 268:19.)

The Court finds an important demonstration of Zurich's belief that it was a following underwriter in Zurich's indication that a settlement offer made by "lead Underwriters" would insulate it from any bad faith claims. (Ex. 250; Morley test., Vol. I, pp. 184:2 – 186:7.)

Moreover, on February 27, 2000, Mr. Brennan confirmed, in writing, Zurich's continuing participation/subscription in Halter's policy for the term of March 1, 2000 through October 1, 2000, and his understanding that Zurich "followed the London lead." (Ex. 33; Brennan depo., pp. 83:25 – 84:17, 85:14 – 16, 85:22 – 86:1, 86:5 – 11, 87:19 – 88:6, 100:9 – 19.) Mr. Brennan stated that the industry terms "subscription" and "participation" are interchangeable. (Brennan depo., p. 48:5 – 11.) Zurich never objected to Mr. Brennan's February 27, 2000 correspondence. (Brennan depo., pp. 88:23 – 89:5, 89:15 –19; Lord test., Vol. VIII, pp. 94:18 – 22, 99:11 – 14.)

Zurich's intention and understanding that it followed London's Lead with respect to underwriting and claims was further established by Mr. Morley and Mr. Lord's repeated use of the terms lead or lead underwriter in reference to London Underwriters in various exhibits introduced at trial.[12]

Perhaps Zurich's most telling acknowledgment that the London Underwriters were the Leader and Zurich was a follower in all respects, including claims, is found in Mr. Morley's "Large Loss Report" dated August 30, 2002 sent to Mr. Jeronimo with a copy to Mr. Lord:

> Our coverage is under the Builder's Risk coverage of this policy and *we have a 15% following line interest* during this policy year.
>
> *   *   *
>
> We are awaiting the formal survey and cause and origin report, as well as the *lead underwriter's interests (London)* regarding reserving and what additional steps/investigation is to be taken *regarding this claim*.

(Ex. 254, Large Loss Report dated August 30, 2002; Lord test., Vol. VIII, pp. 110:25 – 111:10, 113:6 – 14, 125:2 – 126:1.)

---

12. *See, e.g.,*
   Ex. 63 ("London (lead underwriters) have hired a cause and origin investigator"),
   Ex. 78 ("has the lead underwriter made a decision"),
   Ex. 78 ("Does the lead underwriter have a guestimate of a dollar figure?"),
   Ex. 82 ("What has the lead underwriter decided?"),
   Ex. 93 ("has the lead underwriter reserved this file?"),
   Ex. 98 ("have the surveyors assigned by lead underwriters issued any reports?"),
   Ex. 98 ("We note ... vessel owners have tendered abandonment of the vessel ... and we ... trust the lead underwriter will refuse abandonment.),
   Ex. 98 ("Does the lead underwriter agree ... that this vessel is a constructive total loss"),
   Ex. 98 ("Does the lead underwriter have an estimate of what is the residual value of this vessel as is-where is?"),
   Ex. 264 ("Do we have the lead underwriter's position with this claim by the insured?").

Zurich's conduct before and after the ULYSSES fire strongly supports the Court's conclusion that Zurich was a following underwriter, bound in all respects by the lead London Underwriter.  The Court finds that Zurich has, through its words and actions, consistently conceded it was a following underwriter, without reservation.

**E.  The Delinquent Production Of Zurich's "Policy"**

Zurich argues its position from the terms of a separate policy that it claims governs the relationship between the parties.  However, according to Ed Brennan, Charles deCuir, Robert Shepherd, and Simon Fox, Zurich never issued a "policy" to anyone, including Halter or its foreign or domestic broker, during the time-frame that it was on this risk.  (Brennan depo., pp. 44:25 – 45:1 – 3; Fox depo., p. 32:6 – 12; deCuir test., Vol. VI, p. 18:21 - 23; Shepherd test., Vol. VI, p. 122:2 - 6.)  According to Mr. Brennan, the Zurich "policy number" [as opposed to an actual policy] that Zurich provided to Halter's broker Ed Brennan of Palmer & Cay was used for accounting purposes only.  (Brennan depo., pp. 74:16 – 77:6.)

Contrary to the testimony of all other witnesses, Mr. Lord testified that he personally "issued" Zurich's policy at the time of the cancel and rewrite.  (Lord test., Vol. VIII, pp. 90:16 – 91:3.)  Mr. deCuir never saw Zurich's supposed policy or "anything like it" until the time of trial in February of 2005.  Nor did Robert Shepherd, who first saw Zurich's policy in connection with his deposition in November 2004.  (Shepherd test., Vol. VIII, p. 122.)  Neither did Ed Brennan.  (Brennan depo.,  pp. 44:25 – 45:11, 134:19 – 24.)  According to Mr. Brennan, Zurich neither issued a policy, nor did it provide a declarations page.  (Brennan depo, p. 62:10 –  14.)

Zurich did not produce a "certified copy" of its "policy" until requested to do so in discovery. This document was produced in Zurich's responses to Felham's Request for Production about two

weeks after it was certified by Mr. Lord on January 15, 2004.  (Ex. 374, Zurich's "Certified Policy" dated January 15, 2004.)  Ironically, Mr. Lord swore under oath in the "certification" of the Zurich policy that Zurich had a "subscription of 15%" in "Halter Marine's Marine Package Policy for the period 3/1/00 - 10/1/00."  (Ex. 374.)  Larry Jeronimo, Zurich's head of marine claims in New York testified that the policy was a "subscription policy."  (Jeronimo depo., p. 31:21 – 22.)  The "policy" that Mr. Lord certified[13] and attested under oath on January 15, 2004 again designated London as the "Leader" on the fourth unnumbered page.  (Ex. 374.)

The Court accepts the testimony of several witnesses that, under the terms of its "subscription" to Halter's Marine Package Policy (Ex. 11) and as certified by Mr. Lord in January of 2004 (Ex. 374), Zurich is a subscribing underwriter obligated to follow the Lead London Underwriters in all respects, including claims and settlement agreements, amendments to the policy, endorsements to the policy, and increases in values of the vessel's insured under the Marine Package Policy.  (deCuir test., Vol. VI, pp. 17, 22, 26 – 27; Brennan depo., pp. 68:4 – 14, 73:24, 81:8, 85:14, 88:6, 100:9, 101:4, 105:15 – 25, 108:6, 110:18; Priser depo., pp. 25:17, 26:5, 64:16, 65:5, 73:14 – 19, 166:14 – 17, 168:20 – 22, 173:16 – 22; Shepherd test., Vol. VIII, p. 122.)

Despite Zurich's position to the contrary, the "certified policy" produced in discovery by Zurich's Atlanta office contains the same "conditions" with respect to lead/follow as does the Lloyd's Marine Policy form to which Zurich's Houston office originally agreed at inception of the Policy on

---

13.    At trial, Mr. Lord seemed to alter his certification, testifying that his use of the word "subscription" was a "mistake" because Zurich could not subscribe to a Lloyd's policy.  However, under the express wording of the certification, Zurich did not subscribe to the Lloyd's Policy, but to the "Halter Marine Package Policy."  In other words, Mr. Lord is correct that Zurich could not subscribe to the Lloyd's policy itself, but Zurich could and did subscribe to Halter's Marine Package Policy which used the Lloyd's Marine Policy form.  (Lord test., Vol. VIII, pp. 64:23 – 76:21.)

October 1, 1997.  (*See* Ex. 11, Bates page numbers 00138-00139).  Specifically, the Marine

Program, found on the first unnumbered page of Zurich's certified policy, provides:

> All terms, clauses, and conditions as per wording agreed by leading
> Company and Lloyd's Underwriter.
>
> It is agreed that any amendments and/or agreements and/or
> alterations and/or increases (not exceeding written line) or decreases
> in value, to be agreed by leading Company and Lloyd's Underwriter.

(Ex. 374, Marine Program made a part of Zurich Certified Policy.)  Moreover, the Zurich "certified

policy" adopted the Lloyd's Marine Policy *form* by expressly stating on the declaration page that

Zurich's insurance was subject to "London's *forms* and endorsements."  (Ex. 374.)

At trial, Mr. Morley could identify no language in the policy that allowed Zurich to reject

or approve endorsements.  (Morley test., Vol. II, pp. 300:11 – 301:2.)  Nor could Mr. Morley cite

any policy provision that would allow Zurich, as opposed to the London Leader, to agree to

increases in value (Morley test., Vol. II, pp. 301:7 – 302:16), and was not aware of any wording that

would allow Zurich to reject Cover Note Addendums.  (*Id.,* Morley test., Vol. II, p. 296:6 – 13.)

**F.      Even If Zurich Was Not Bound To "Follow", It Took No Timely Action To Object To
Critical Endorsements And Settlement Agreements, Despite Knowledge Of These
Activities**

By virtue of its subscription in Halter's Marine Package Policy, and all of its terms and

conditions, Zurich was apprised of all decisions and agreements of the Leader, including:  (a)

Endorsement 232 (Ex. 19) and corresponding Cover Note Addendum 90 (Ex. 11); (b)  Endorsement

233 (Ex. 20) and corresponding Cover Note Addendum 100 (Ex. 11); (c)  The letter agreement of

settlement dated March 24, 2003 (Ex. 293); (d)  The Settlement and Release Agreement of May 8

and 12, 2003 (Ex. 109); and (e)  London's Endorsements of Settlement dated April 4, 2003 (Ex. 297)

and (Ex. 298).  Plaintiffs contend, and the Court agrees, that Zurich is bound by these documented

agreements.

In particular, Endorsement 232, which corresponds to Cover Note Addendum 90,

acknowledged the Leader's agreement that:

> The Vessel "ULYSSES" should have correctly been reported under
> Section 1 (Builder's Risks) of the 1999/2000 year with an inception
> date of 24th August 2000 per the attached letters from Friede
> Goldman Halter, Inc. ...

(Ex. 20, Endorsement 233; Ex. 11, Addendum 90.)  Further, Endorsement 232 and corresponding

Cover Note Addendum 90 established that the Leader agreed to an increase in value of the

ULYSSES to US $14,700,000.  (*Id*); (Morley test., Vol. II, pp. 307:8 – 308:9.)

In Endorsement 233 and corresponding Cover Note Addendum 100, the Leader agreed that:

> The final contract value (FCV) of the "ULYSSES" is correctly
> reported as US$19,714,456 and the Owner Furnished Equipment is
> reported as US$3,000,000 for the months of May-June inclusive
> increasing to US$5,773,976 for the month of July.
>
> Endorsement No. 232, dated 31st July 2002, adjusted the reporting
> from inception to the end of April, 2002 on the basis of an agreed
> final contract value of US$14,700,000.  It is necessary to correct the
> reporting from inception to the end of July 2002 on the basis of an
> agreed FCV of US$19,714,456.

(Ex. 20,  Endorsement 233;  Ex. 11, Cover Note Addendum 100; Morley test., Vol. II, pp.

304:21 – 308:9.)

Likewise, Zurich is bound by the Leader's settlement agreement with Felham, Trinity and

Halter in the amount of $23,778,000 as set forth in the March 24, 2003 letter agreement in Exhibit

293.  (Morley test., Vol. I, p. 203:15 – 25.)  The March 24, 2003 letter agreement provides for a total

settlement of $23,553,000, plus an additional $225,000 in Sue and Labor, for a total settlement of $23,778,000. The terms of the settlement were later memorialized in the Settlement and Release Agreement as found in Exhibit 109 and executed on May 8 and 12, 2003. Mr. Morley was provided with a copy of the Settlement and Release Agreement, which he acknowledged as the "formal settlement agreement that memorialized the March 24, 2003 Letter Agreement." (Morley test., Vol. I, pp. 210:23 – 211:13.) The Letter Agreement of March 24, 2003 evidences Felham's settlement of $21,833,000, of which Zurich's 15% subscription amounts to $3,274,950. (Ex. 293.) Again, Zurich did not object or seek to exercise the right of rejection it now claims.

Prior to the written memorialization of settlement in the Settlement Agreement of May 8 and 12, 2003, by letter dated April 3, 2003 (Ex. 295), Halter tendered the settlement to Zurich:

> On behalf of the named assured, Halter Marine, Inc., we call upon Zurich to agree to pay its 15% portion of this settlement on the same terms as London Underwriters, which, according to our calculation, is $3,532,950 for the Builder's Risk claims and $33,750 for the Sue and Labor claims.

(Ex. 295; Morley test., Vol. II, pp. 203:21 – 25, 204:11 – 17.) Again, Zurich did not object to the settlement or in any way seek to exercise its claimed right of consultation. (Morley test., Vol. I, p. 208:4 – 21.)

The Leader's Settlement Agreement was formally endorsed to the Policy by Endorsements dated April 4, 2003, as found in Exhibits 297 and 298. These "London Endorsements" (Zurich's policy is subject to London's Endorsements) expressed the settlement agreement of $23,778,000 with respect to the fire aboard the yacht "ULYSSES". (Exs. 297 and 298.) The London endorsements were "scratched" (or executed) in London by Les Wilton, overall and Lloyd's Leader, and by Sylvana Milton, Company's Leader, and by Colin Webb, of Exchanging Claims Services.

-39-

(Les Wilton depo, pp. 85:15 – 105:24.)  The endorsements of settlement dated April 4, 2003 (Exs. 297 and 298) are further memorialized in Endorsement 233 and Cover Note Addendum 100.  (Ex. 20, Endorsement 233; Ex. 11, Cover Note Addendum 100.)  Specifically, Endorsement 233 and Cover Note Addendum 100 notes that:  "ULYSSES claim agreed at US $23,778,000."

In sum, although Zurich was repeatedly made aware of settlement negotiations and of the Leader's agreement of settlement with Felham, Trinity and Halter, and although Zurich asserts it has a right of consultation and/or a right of rejection with respect to any decision or agreement made by the Lead, at no time did Zurich in any way object to the settlement negotiations, the Letter Agreement of March 24, 2003, the memorialization of the settlement in the Settlement and Release Agreement of May, 2003, or the April 4, 2003 Endorsements of the Settlement Agreement to the Policy.

Moreover, although Endorsement 233 and Cover Note Addendum 100 expressly referenced the settlement of the ULYSSES claim at $23,778,000, Zurich never exercised its now-claimed right to dispute or disagree with the Leader.  Mr. Lord testified that, if he does not object to a Cover Note Addendum, it becomes an Endorsement and a part of the Policy.  (Lord test., Vol. VIII, p. 117:12 – 16.)  Dan Lord conceded that he never rejected an Endorsement or a Cover Note Addendum (Lord test., Vol. VIII, p. 90:5 –  8), and Zurich put on no evidence through exhibits or testimony that it objected to Cover Note Addendum 100.  Mr. Morley testified that he knew of no documents whereby Zurich ever evidenced a rejection of Cover Note Addendum 100.  (Morley test., Vol. II, p. 316:8 – 11.)  Accordingly, even if Zurich had a right to reject the decisions and agreements of the London Lead, Zurich failed to exercise this purported right of rejection and is thereby bound by Leader's settlement.

## VI.   HALTER'S AND FELHAM'S CLAIMS

**A.      Insurance Proceeds**

Halter, as the named insured, is the party who has the right to both make the claim on behalf of all parties and settle the claim on behalf of all parties.  (Morley test., Vol. I, pp. 204:18 – 23, 216:17 – 217:1.)  Halter's claim is for the "entire risk," *i.e.*, the entire value of the hull at the time of the fire.  (Morley test., Vol. I, p. 217:2 – 5.)  Nevertheless, Halter was required by contract to and did name the vessel owner, Felham, as a loss payee, and Felham is a loss payee in accordance with the blanket loss payee provisions of the policy set out in Cover Note Addendum No. 35.  (Fox depo., p. 23:6 – 9.)

Zurich has paid $1,517,663.55 under the Halter Policy.  As loss payee, Felham is entitled to recover 15% of its $21,833,000 settlement from Zurich, which amount is $3,274,950, less the $1,517,663.55 tendered on May 11, 2004.  Pursuant to the terms of the settlement agreed to by the lead London Underwriters, Halter is still owed, and is entitled to recover, $231,600.00.

**B.      Halter's Claim For Zurich's Bad Faith Under Louisiana Law**

The Court previously found that Halter is the appropriate party with standing to assert a bad faith claim pursuant to La. R.S. 22:1220 and 22:658.  (*See* December 6, 2004 and January 24, 2005 Orders and Reasons, Rec. Doc. Nos. 329 and 376.)  The relevant statutes provide as follows, in pertinent part:

> A.      An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing.  The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both.  Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

> B.      Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A:

      (1)      Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.

      (2)      Failing to pay a settlement within thirty days after an agreement is reduced to writing.

      (3)      Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.

      (4)      Misleading a claimant as to the applicable prescriptive period.

      (5)      Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

C.      In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

La. R.S. 22:1220 (A. - C.).

B. (1)  Failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor, as provided in R.S. 22:658(A)(1), or within thirty days after written agreement or settlement as provided in R.S. 22:658(A)(2) when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of ten percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, together with all reasonable attorney fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, ten percent of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney fees for the prosecution and collection of such amount.

La. R.S. 22:658 (B)(1).[14]

---

    14.  La. R.S. 22:658 was amended effective August 15, 2003, to provide for a 25% penalty. The statute cited is applicable to this loss, which occurred on July 2, 2002.

Proof of actual damages is not a prerequisite to the recovery of penalties for an insurer's breach of statutory duties of good faith and fair dealing and fair and prompt adjustment of claims. *Soltana Corporation v. Jewelers Mutual Insurance Co.,* 860 So. 2d 1112, 1117 (La. 2003). Statutory penalties are discretionary, rather than mandatory, for an insurer's breach of duty of good faith and fair dealing and breach of duty to promptly adjust claims. *Calagero v. Safeway Insurance Company of Louisiana,* 753 So. 2d 170, 174 (La. 2000).

**C.     Zurich's Own Policies**

Zurich's Property Claims Best Practices – Product Management manual (Ex. 127) provides in pertinent part:

> <u>**COVERAGE**</u>
>
> ***
>
> **Timely Recognition and Advice Coverage Issues**
>
> All applicable coverage issues are recognized immediately upon receipt of information (first notice, pleading, letter investigation report, etc.) evidencing the potential coverage issues.  All coverage issues are proactively resolved in a timely manner.
>
> **Coverage Investigation**
>
> Investigation of facts relevant to coverage issues initiated immediately after receipt of information evidencing said issue.  Investigation is pursued in a proactive manner until all necessary information is obtained.  File documentation must reflect all coverage investigation efforts.
>
> **Timely Coverage Communications**
>
> An effective coverage analysis and determination will be made as soon as practicable, but no more than 30 days from our receipt of all necessary coverage – related information.
>
> (Page 1 of actual document.)
>
> ***

-43-

**CUSTOMER SERVICE**

***

**Timeliness**

Phone call must be returned within 24 hours.  Letters are to be acknowledged and responded to in a timely manner.  Claims submissions are likewise be reviewed and discussed with the insured in a timely professional manner. Claims handling begins with contact of the insured/agent/broker.  The file should reflect it.

Contact can be with the insured and/or broker.  Immediate contact with the underwriter on all losses communicating the full details of the loss and requesting a copy of the policy including reinsurance documentation.

(Page 2 of actual document.)

***

**Communication**

The case manager shall communicate with the insured on a regular basis (at least every 90 days) throughout the life of the claim to ensure that the insured is appropriately apprised of the status and resolution strategy of the claim.

(Page 2 of actual document.)

***

**COVERAGE INVESTIGATION**

**Coverage Letter**

In the event that we identify a coverage issue(s), we will obtain a non-waiver agreement or issue a detailed reservation of rights or declination letter (as appropriate) to our insured as soon as practicable, but no longer than thirty (30) days from our receipt of information evidencing said issue(s).

(Page 2 of Edition 9-4-2003.  Emphasis in the original).  The Property Claims Best Practices –

Product Management manual (Ex. 127) is a document that was being used in Zurich's Atlanta office

at the time of the ULYSSES fire.  (Morley test., Vol. I, pp. 80:25 – 81:6.)

Zurich's claims adjuster responsible for adjusting this loss, Mr. Morley, agreed that all coverage issues were to be proactively resolved in a timely manner (Morley test., Vol. I, p. 84:5 – 10), and agreed that investigations are to be pursued in a proactive manner.  (Morley test., Vol. I, pp. 84:11 – 18, 85:16 – 19.)  Mr. Morley was aware of Zurich's internal policy that letters are to be acknowledged and responded to in a timely manner.  (Morley test., Vol. I, p. 85:5 – 9.)  Mr. Lawrence Jeronimo, Zurich's Marine Claims Director for the entire United States and Mr. Morley's supervisor, stated that acting in good faith includes, "[b]eing responsive to every claim and keeping an open mind about – and providing service to the customer."  (Jeronimo depo., p. 47:2 – 12.)  Mr. Jeronimo further stated that Mr. Morley "is required to follow [Zurich's] Best Practices."  (Jeronimo depo., p. 81:13 – 19.)  As set forth hereinafter, Zurich breached its own "Best Practices" in investigating and adjusting the ULYSSES claim, as well as its failure to communicate with its insureds.

**D.    Halter Correspondence To Zurich**

On July 3, 2002, Willis of North America, Halter's domestic insurance broker, contacted Zurich and notified it of the loss.  (Ex. 227.)  Halter presented Zurich with updated claim amounts on the following days:  (a)  **October 4, 2002** - Formal claim of Trinity submitted through Halter: "Halter Marine Inc. hereby submits the following claim for Sue and Labor and preservation costs incurred for the ULYSSES as a result of the fire onboard the vessel on July 2, 2002." (Ex. 262); (b) **October 9, 2002** - Supplemental Claims of Felham and Trinity submitted through Halter: "At the request of Trinity Yachts, L.L.C. ("Trinity") and Felham Enterprises (Cayman), Ltd. ("Felham") we submit the enclosed October 4, 2002 supplemental claim of Trinity and Felham for the captioned loss."  (Ex. 263); (c)  **October 18, 2002** - Formal Claim of Halter: "Halter Marine, Inc. hereby

submits the following damage claim for $2,548,384.83 in losses sustained as a result of the fire on board the ULYSSES on July 2, 2002." (Exs. 92 and 264.) Zurich did not acknowledge or respond to any of the above claims. (Morley test., Vol. I, pp. 142:23 – 144:4, 144:15 – 145:13, 145:21 – 147:23.)

Halter tendered the ULYSSES to all underwriters for purposes of abandonment of the vessel on November 1, 2002. (Ex. 265; Morley test., Vol. I, pp. 157:7 – 158:1.) Lead London Underwriters responded to this tender by declining the abandonment of the vessel. (Ex. 266; Morley test., Vol. I, p. 158:2 – 14.) Zurich did not respond to Halter's November 1, 2002 tender. (Morley test., Vol. I, pp. 158:15 – 159:3.)

On December 6, 2002, Zurich received a letter drafted by Halter's counsel discussing the various settlement offers that had been presented by the respective parties in dealing with lead London Underwriters. (Ex. 275; Morley test., Vol. I, pp. 163:6 – 164:4.) Zurich did not respond to Halter's December 6, 2002 letter. (Morley test., Vol. I, pp. 164:9 – 165:13.) Halter further requested that Zurich provide it with an acknowledgment of coverage on the following days: (a) **February 11, 2003**, Letter from David Bland to David Shaw, Zurich's in-house counsel: "…we would appreciate it if you would please provide us with Zurich's formal position with respect to coverage for the claims arising out of the referenced fire aboard the ULYSSES on July 2, 2002." (Ex. 287; Morley test., Vol. I, pp. 190:10 – 191:10); (b) **February 13, 2003**, Letter from David Bland to Robert Clotworthy: "As I previously requested from Zurich's former counsel, David Shaw, on behalf of Halter Marine, Inc., we would appreciate it if you would please provide us with Zurich's formal position with respect to coverage for the claims arising out of the referenced fire aboard the ULYSSES on July 2, 2002… Our file does not reflect that Zurich has ever formally

-46-

responded." (Ex. 288; Morley test., Vol. I, pp. 192:17 – 193:8, 194:4 – 6); (c) **March 7, 2003**, Letter from David Bland to Robert Clotworthy: "Zurich had surveyors in attendance aboard the vessel during the initial fire investigation.  However, we still have not received confirmation from Zurich that they will provide coverage for the various claims which have arisen as a result of the fire.  We would appreciate you providing us with Zurich's position." (Ex. 291; Morley test., Vol. I, pp. 196:2 – 197:7); and (d) **April 21, 2003**, Letter from David Bland to Robert Clotworthy: "It has now been over 9 months since the ULYSSES fire.  Zurich was placed on notice of the fire immediately thereafter and had investigators appointed to attend the various surveys and meetings regarding the incident.  Since that time Halter Marine, Inc has requested confirmation of coverage from Zurich.  We received no response." (Ex. 301; Morley test., Vol. I, p. 207:2 – 21.)  Zurich never responded to any of these letters.  (Morley test., Vol. I, p. 215:6 – 10.)

On April 3, 2003, Halter sent a letter to Zurich's counsel informing him that a letter agreement has been executed by representatives of Halter, Felham, Trinity and lead London Underwriters confirming a settlement agreement, and calling upon Zurich to join in that settlement agreement or officially decline same within seven (7) days.  (Ex. 295; Morley test., Vol. I, pp. 203:7 – 204:10.)  Zurich did not respond to Halter's April 3, 2003 letter.  (Morley test., Vol. I, pp. 204:18 – 205:9.)  In its letters of February 13, 2003 (Ex. 288) and April 3, 2003 (Ex. 295), Halter asks Zurich to please let it know if Zurich requires "any further information."  (Morley test., Vol. I, p. 216:8 – 16.)   Zurich's admitted failure to respond in any way whatsoever in the face of these express requests for information is indicative of bad faith.

E.      **Zurich's Claim Handling (*i.e.*, Failure To Respond)**

Mr. Morley was Zurich's only claims adjuster handling the ULYSSES loss (Morley test., Vol. I, p. 239:6 – 10), and admitted that Zurich "probably" violated its own internal policy to timely

communicate and report to Halter.  (Morley test., Vol. I, pp. 201:15 – 203:6.)  Mr. Morley never

contacted Halter directly.  (Morley test., Vol. I, p. 87:18 – 24.)  Until May 29, 2003, almost eleven

months after the fire on the ULYSSES, Zurich never contacted Halter in writing (in response to any

of the above correspondence or generally) about this claim (Morley test., Vol. I, p. 221:10 – 13);

regarding coverage for this loss (Morley test., Vol. I, p. 215:6 – 10); or in any manner regarding the

extent of this loss.   (Morley test., Vol. I, pp. 215:20 – 216:16.)

It is also undisputed that Zurich never issued a reservation of rights letter.  (Morley test., Vol.

I, pp. 193:9 – 194:3.)  Zurich further conceded that it could have contacted Halter's counsel, or Mr.

Robert Shepherd, Halter's Vice President of Risk Management, at the time of the ULYSSES fire,

or Ms. Sharon Beaugez, Halter's Contact Administration Coordinator, prior to and during the

construction of the ULYSSES, if it needed more information regarding this loss.  (Morley test., Vol.

I, pp. 148:12 – 149:11.)  Zurich never contacted Mr. Shepherd (Shepherd test., Vol. VI., p. 178:14

– 23), or any of these other Halter representatives.  (Ex. 227; Morley test., Vol. II, p. 272:1 – 5.)

Zurich nonetheless was cognizant that it "MAY have some issues as far as bad faith is

concerned[.]"  (Ex. 250) (Emphasis in the original).  As of July 24, 2003, Zurich believed that it

might be a good idea to mediate this case so that it could "make this a matter of valuation

discrepancy rather than one of file handling – MS [Mississippi] is not a fun jurisdiction to deal with

file handling, generally."  (Ex. 250.)  Zurich believed that, in mediation it could "approach the claim

handling issues and valuation issues very easily by explanation rather than by 'court proof'

(depositions, discovery and the like)."  (Ex. 250.).

Once mediation was ruled out, Zurich's noted defense strategy of August 4, 2003 included,

for the first time, "us [Zurich] bringing fraud claims should the loss reports and surveys of the loss

conflict and reek of suspicion enough to make a claim or threaten making a fraud claim, if it gets to that." (Ex. 250.) Zurich further stated on August 4, 2003, "[w]e are not going to be threatened by their BF [bad faith] claims, since there is none, and we are not going to be threatened by 'London's report & payment.'" (Ex. 250.) Notwithstanding these minatory notations, Zurich admittedly did not have any defenses to coverage, including potential fraud claims, for this loss as of August 22, 2003. (Morley test., Vol. I, pp. 223:13 – 224:9, 239:6 – 13.)

As of October 20, 2003, Zurich still had not discovered any facts supporting a fraud claim against Halter, but it was still hoping that its attorneys would unearth some: "Hi Bobby [Robert Clotworthy], touching base on this file…Please advise of any developments in this matter, or any other facts you may have discovered to support some sort of fraud claim by us [Zurich]." (Ex. 250.) Undaunted by a lack of supporting evidence, Zurich pursued this strategy through trial.

## F.    Zurich's Investigation And Survey By Rivers And Gulf

Zurich hired Rivers and Gulf on July 9, 2002. (Morley test., Vol. I, pp. 92:15 – 93:12.) On July 12, 2002, Rivers and Gulf was instructed to answer only six (6) limited questions for Zurich, none of which included a repair estimate or determination of the value of the hull, pre or post loss. (Ex. 230; Guy Plaisance test., Vol. X, p. 146:22 – 25.) Zurich (consistent with its "following" status) did not instruct Rivers and Gulf to perform a nature, cause and extent damage survey on its behalf until August 1, 2002, thirty (30) days after the fire, despite the fact that the best time to perform a fire investigation, in order to determine the nature, cause, and extent of the damage, is just after the fire. (Ex. 241; Plaisance test., Vol. X, pp. 147:1 – 11, 158:9 – 12.) Rivers and Gulf was the only marine surveyor hired by Zurich to perform a nature, cause and extent damage survey on its behalf or investigate this claim. (Morley test., Vol. I, pp. 96:25 – 97:3, 98:15 – 17.) Zurich was

relying on the information collected by Rivers and Gulf, as well as its report, to make a determination as to the nature, cause and extent of the damage suffered by the ULYSSES. (Morley test., Vol. I, pp. 98:18 – 99:2.)  In fact, Zurich relied on the May 11, 2003 Preliminary Advice of Rivers and Gulf to make its "offer of settlement" to Halter.  (Morley test., Vol. I, pp. 211:14 – 212:21.)  The Court concludes that Rivers and Gulf was Zurich's agent for purposes of investigation into the ULYSSES claim.

Mr. Plaisance first visited the ULYSSES on July 31, 2002 (Ex. 348; Plaisance test., Vol. X, p. 158:4 – 8), and attended the joint surveys on behalf of Zurich in August 2002.  (Ex. 348; Plaisance test., Vol. X, p. 146:18 – 21.)  Mr. Plaisance did not "sign-off" on the joint survey report of August 16, 2002, because he "had a lot of concerns with it" and "wasn't in agreement with it."  (Plaisance test., Vol. X, pp. 55:9 – 22, 61:7 – 22.)

Despite his stated reasons for not signing off on the August 16, 2002 joint survey report, Mr. Plaisance did not continue his independent survey and investigation of the ULYSSES throughout the months of September and October.  (Ex. 348; Plaisance test., Vol. X, pp. 159:20 – 160:1.)  As of November 8, 2002, however, Zurich believed that Rivers and Gulf was diligently investigating this loss.  (Morley test., Vol. I, p. 161:4 – 9.)  In reality, from November 1, 2002 through February 20, 2003, Mr. Plaisance only spent 5.75 hours pursuing his investigation and survey of the ULYSSES.  (Ex. 348.)

Mr. Plaisance received CTC Report No. 6 in December 2002, yet he only spent 2.25 hours continuing his investigation and survey of the ULYSSES.  (Ex. 348; Plaisance test., Vol. X, p. 172:10 – 24.)  Zurich expected Rivers and Gulf to perform its own independent analysis and provide its own independent conclusions in carrying out its survey.  (Morley test., Vol. I, p. 118:12 – 15.)

-50-

From February 21, 2003, through the date Mr. Plaisance issued his first Preliminary Advice, he spent 11.5 hours meeting with Zurich attorneys.  (Ex. 348; Plaisance test., Vol. X, pp. 172:25 – 173:7.)  On March 12, 2003, Mr. Plaisance spent 5 hours meeting with one of Zurich's attorneys prior to drafting his first Preliminary Advice.  (Ex. 348; Plaisance test., Vol. X, p. 173:11 – 13.)  On March 27, 2003, Mr. Plaisance spent another 5 hours meeting with one of Zurich's attorneys while in the process of drafting his first Preliminary Advice.  (Ex. 348; Plaisance test., Vol. X, p. 173:14 – 16.)  Mr. Plaisance admits that he had discussions regarding the points of his first Preliminary Advice with Zurich's counsel prior to that report being issued.  (Plaisance test., Vol. X, p. 175:11 – 23.)

On November 6, 2002, Zurich believed that Rivers and Gulf "will issue a report soon."  (Ex. 97.)  On January 2, 2003, Zurich allegedly began to "push for the surveyor [Rivers and Gulf]" to issue its report.  (Ex. 250; Morley test., Vol. I, p. 183:9 – 18.)  On January 20, 2003, Zurich re-emphasized internally its need to obtain Rivers and Gulf's report.  (Ex. 107; Morley test., Vol. I, pp. 188:18 – 189:4.)  On February 4, 2003, Mr. Jeronimo requested that Mr. Morley "push the surveyor for their report."  (Ex. 286; Morley test., Vol. I, p. 189:17 – 25.)

Also on February 4, 2003, Zurich decided to assign its attorneys with the responsibility of obtaining the Rivers and Gulf report.  (Ex. 286; Morley test., Vol. I, p. 190:1 – 3.)  Mr. Morley again acknowledged on February 12, 2003 that he "[N]eed[s] Rivers & Gulf survey rept. ASAP.  Will have attys. apply pressure to surveyor for rept."  (Ex. 250; Morley test., Vol. I, pp. 191:22 – 192:4.)  Zurich now admits that Rivers and Gulf was so late producing a report that it had to get its own attorneys to apply pressure on its own surveyor.  (Ex. 290; Morley test., Vol. I, p. 192:5 – 16.)

On March 14, 2003, Mr. Morley recorded the following statement in the Z-Notes: "Discussed matter with our counsel (Bob Clotworthy) … He has a letter going to the surveyor (Rivers & Gulf) demanding a report from them[.]" (Ex. 250.) On April 1, 2003, Zurich claims to have already made "demand" that Rivers and Gulf produce a written report. (Ex. 250; Morley test., Vol. I, pp. 200:4 – 201:23.) Despite Zurich's position, Mr. Plaisance claims to have only been prompted once by Zurich in December 2003 (sic 2002) to produce a report. (Plaisance test., Vol. X, pp. 170:19 – 172:3.) Indeed, Mr. Plaisance's bill to Zurich only reflects two (2) phone calls with Mr. Morley, one in July 2002 and one in November 2002. (Ex. 348; Plaisance test., Vol. X, p. 172:4 – 9.)

Once Zurich instructed Rivers and Gulf to perform a nature, cause and extent survey, on August 1, 2002, it expected Rivers and Gulf to issue a written report within 30, 60 or 90 days. (Morley test., Vol. I, pp. 93:13 – 95:22.) On August 26, 2002, Mr. Plaisance gave Zurich a preliminary, verbal repair estimate of $8 – 10 million, despite the fact that he admittedly knew "not much" about this claim as of November 6, 2002. (Exs. 82 and 97; Morley test., Vol. I, pp. 132:16 – 133:1, Vol. II. pp. 287:6 – 288:4.)

Zurich did not forward copies of Rivers and Gulf's reports to Halter until May 29, 2003, at which time it produced two "Preliminary Advices," the first dated April 11, 2003, and the second dated May 9, 2003. (Exs. 111, 133 and 336.) Rivers and Gulf's first Preliminary Advice of April 11, 2003 reported an estimated repair cost of $11,430,232.00. (Ex. 133.) Rivers and Gulf's second Preliminary Advice of May 9, 2003 reported an estimated repair cost of $10,117,757.00. (Ex.

336.)[15] Zurich relied on Rivers and Gulf's May 11, 2003 Preliminary Advice to make its first "offer of settlement" to Halter.  (Morley test., Vol. I, pp. 211:14 – 212:21.)  At no time did Zurich ever contact Halter and inform it that Zurich was having trouble obtaining information.  (Morley test., Vol. IX, p. 71:10 – 16.)  At no time did Zurich take the position with Halter, that because its broker was allegedly slow in giving Zurich information, Zurich was either reserving its rights on coverage or denying the claim.  (Morley test., Vol. IX, p. 71:17 – 21.)  Mr. Lord is also "not aware of Zurich taking the position that this claim was not being paid because of tardiness or information or anything of that coming in."  (Lord test., Vol. VIII, p. 124:7 – 14.)[16]

The Court finds Rivers and Gulf, and therefore Zurich, failed to reasonably investigate the ULYSSES claim in violation of La. R.S. 22:658 and 22:1220.

**G.    Zurich's Failure To Unconditionally Tender The Undisputed Portion Of Halter's Claim**

In addition to the Halter correspondence listed hereinabove, *supra*, Zurich also received "satisfactory proof of loss" on the following days:  (a)  December 3, 2002, the date CTC Report No. 6 is forwarded to Keith Morley (Ex. 104); (b)  April 11, 2003, the date Zurich received Rivers & Gulf's first Preliminary Advice (Ex. 133); and ©)  May 9, 2003, the date Zurich received Rivers and Gulf's second Preliminary Advice (Ex. 336).

---

15.    To contrast, by September 27, 2002, CTC Services, the marine surveying company initially hired by Zurich Specialties London Ltd., one of the lead London Underwriters, had issued seven (7) written reports regarding the ULYSSES loss.  (Ex. 129(g).)

16.    CTC Services contacted Felham, Halter and Trinity directly to get the information that it needed to investigate this loss.  (Poulos test., Vol. IV, pp. 682:15 – 683:7, 749:14 – 18; Shepherd test., Vol. VI, p. 149:12 – 19.)  Halter cooperated with CTC Services, who at the time was working for lead London Underwriters, in an effort to provide it with all the documentation and information that it needed to timely adjust this loss.  (Poulos test., Vol. IV, pp. 749:14 – 750:10.)  Zurich could have similarly called Felham, Halter or Trinity to get the information that it needed.  (Poulos test., Vol. IV, p. 750:11 – 14.)  In fact, Halter contacted Zurich on two occasions and asked if it required "any further information."  (Exs. 288 and 295; Morley test., Vol. I, p. 216:8 – 16.)

Zurich made its first "offer of settlement" to Halter on May 29, 2003. (Ex. 111; Morley test., Vol. I, p. 224:10 – 18; Jeronimo depo., pp. 60:12 – 61:4). Zurich specifically authorized the May 29, 2003 "offer of settlement," drafted by Robert Clotworthy on its behalf. (Morley test., Vol. I, p. 213:8 – 13.) Zurich admits that its May 29, 2003 letter is not an unconditional tender of its 15% share of the loss, but rather an "offer of settlement" with "some conditions."[17] (Morley test., Vol. I, p. 224:10 – 18; Jeronimo depo., p. 61:5 – 9.) Zurich based its May 29, 2003 "offer of settlement" on the repair estimate contained within Rivers and Gulf's May 9, 2003 report. (Morley test., Vol. I, pp. 211:14 – 212:21, 218:1 – 4.) The May 29, 2003 letter also misrepresented that Zurich was involved in "ongoing settlement negotiations" with Halter, that it previously reserved and continues to reserve all rights and defenses, and that Zurich had "serious questions" as to the loss. Mr. Morley's testimony refutes these assertions contained in the May 29, 2003 letter. Zurich admitted that it would not pay Halter the $1,517,663.55, unless Halter agreed to all of these stipulations (Morley test., Vol. I, p. 219:14 – 19), and expected its "offer of settlement" to be rejected. (Exs. 306 and 250; Morley test., Vol. I, p. 236:1 – 3; Jeronimo depo., p. 95:14 – 16.) Halter officially declined Zurich's "offer of settlement" on June 6, 2003. (Ex. 114.)

Zurich made a second conditional settlement offer to Halter on January 16, 2004. (Ex. 118; Morley test., Vol. I, pp. 241:18 – 242:11), which was also rejected by Halter on February 2, 2004. (Ex. 119; Morley test., Vol. I, p. 243:22 – 24.) Zurich admitted that, as of January 16, 2004, it had not been "willing to unconditionally pay any amounts that it owes as a result of the captioned loss." (Morley test., Vol. I, pp. 243:25 – 244:10.)

---

17.  Zurich's May 29, 2003 "offer of settlement" states that it is conditioned on receiving "a full and final release of all claims whatsoever that Halter may have against Zurich. Payment would also be conditioned on full and final release of all alleged claims whatsoever that Trinity and/or Felham may have against Zurich." (Ex. 111.)

On May 11, 2004, Zurich finally paid the exact same amount, $1,517,663.55, that it had conditionally offered to Halter on May 29, 2003.  (Ex. 128; Morley test., Vol. I, p. 247:16 – 22.)

The Court finds as a particularly important fact that in its May 29, 2003 "offer of settlement," Zurich acknowledges that it could pay "the money offered herein into the registry of the Court[,]" *i.e.*, invoke an interpleader action pursuant to Rule 22 of the Federal Rules of Civil Procedure.  (Ex. 111; Morley test., Vol. I, pp. 220:25 – 221:6.)  Zurich admitted that there was nothing preventing it from paying this money into the registry of the Court at that time.  (Morley test., Vol. I, p. 221:7 – 9.)  At the time of Zurich's May 29, 2003 "offer of settlement," Halter had not filed suit against Zurich.  (Morley test., Vol. I, p. 220:3 – 5.)

The Court thus finds that Zurich arbitrarily and capriciously breached La. R.S. 22:658 and 22:1220 by failing to unconditionally tender payment of $1,517,663.55 after receipt of satisfactory proof.

## H.     Zurich's Misrepresentations Regarding Its "Policies"

Normally, following underwriters do not issue their own policies (Lord test., Vol. VIII, pp. 53:20 – 54:3), and neither Mr. deCuir nor Mr. Shepherd ever received a policy of insurance from Zurich or Continental (MOAC) during their administration of Halter's Policy. (deCuir test., Vol. VI, p. 18:11 – 23; Shepherd test., Vol. VI, p. 122:7 – 10.)

Zurich did not produce a document which purported to be its own "policy" until mid-to-late January 2004, in response to discovery requests from Plaintiff's counsel, roughly three years and four months after the inception of the ULYSSES project and expiration of the policy term, and some

nineteen months after this loss.  (Ex. 374.)  The Certification attached to this Zurich "policy" states in pertinent part:

> 3.    Attached hereto is a true, correct and complete copy of the Zurich Policy representing its subscription of 15%, for itself and no other, severally and not jointly, and subject to all its terms and conditions, limits, limitations, and deductibles, to Halter Marine's Marine Package Policy of the period of 3/1/00 – 10/1/00 which Policy consists of <u>109</u> pages.

(Ex. 374.)

Despite Zurich's "certification" to the contrary, its sworn and certified "policy" is not true and correct; included within this "policy" is the Continental (MOAC) Marine Program, which Mr. Lord admitted is not a part of the Zurich "policy."[18]  (Ex. 374; Lord test., Vol. VIII, pp. 69:15 – 25, 72:23 – 74:10.)  Furthermore, in order for Zurich's certified and sworn "policy" to be effective, the original must be countersigned by its underwriter, *i.e.*, it must contain an authorized signature (Lord test., Vol. VIII, pp. 56:6 – 10), which is not present on this policy.  (Ex. 374.)  Zurich's certified and sworn "policy" also did not include Addendum 49, which Zurich claims is a part of its policy and upon which it now attempts to rely.  (Lord test., Vol. VIII, pp. 69:8 – 14.)  Zurich then submitted another version of its "policy" with a different certification[19] attached to it at the trial.  (Ex. 162.)

---

18.  Mr. Lord admitted that his "certification" was executed without him actually being in possession of the document that he was certifying: "All I can say is this [the "certification"] was prepared for me by our counsel, and I sent it back and I told him to attach the things."  (Lord test., Vol. VIII, pp. 58:15 – 59:2.)

19.  The Certification attached to Zurich's second "policy" states in pertinent part:

> 3.    Attached hereto is a true, correct and complete copy of the Zurich Policy representing its subscription of 15%, for itself and no other, severally and not jointly, and subject to all its terms and conditions, limits, limitations, and deductibles, to Halter Marine's Marine Package Policy of the period of 3/1/00 – 10/1/00 which Policy consists of ___ pages.  [sic]

The Court finds this irregular procedure indicative of Zurich's insouciant or, at best, ad hoc handling of this claim.

## I.      Halter Is Entitled To Damages, Penalties And Attorney's Fees As A Result Of Zurich's Bad Faith

Halter has established the arbitrary and capricious conduct of Zurich in violation of La. R.S. 22:658 and 22:1220.   Accordingly, Halter is entitled to recover a penalty under La. R.S. 22:658(B)(1) or 22:1220(C), whichever is greater.  *See Calogero,* 753 So. 2d at 174.  (where La. R.S. 22:1220 provides the greater penalty, it supersedes La. R.S. 22:658 such that a penalty cannot be recovered under both statutes).

Halter also is entitled to recover all of its reasonable attorney's fees incurred in the prosecution and collection of the loss from Zurich.  La. R.S. 22:658(B)(1).  The parties agreed that the quantum of Halter's attorney's fees would be submitted after the Court's order and judgment in this matter.

The damages that are recoverable under La. R.S. 22:1220(C) include any damages, foreseeable or not, that are a direct consequence of Zurich's breach.  *Clark v. McNabb,* 878 So.2d 677, 686 (La. App. 3d Cir. 2004); *Williams v. Louisiana Indem. Co*., 658 So.2d 739, 742 (La. App. 2d Cir. 1995) (emphasis added).  Halter's evidence concerning its damages as a direct consequence of Zurich's breach of its duty was not contested.

The record itself indicates that both Felham and Trinity have filed administrative claims against Halter totaling $23,956,281.  (Ex. 234 and 242; Shepherd test., Vol. VI, p. 158:7 – 14.) Halter executives were concerned that such an administrative claim could have prevented Halter's bankruptcy plan from being confirmed.  (Shepherd test., Vol. VI, pp. 158:25 – 159:21.)  The

administrative claims of Felham and Trinity are still pending due to Zurich's failure to pay its portion of the London settlement.  (Shepherd test., Vol. VI, pp. 159:22 – 160:5.)

Andrews & Kurth, Halter's bankruptcy counsel, was required to prepare a response to these filings, to do the legal review necessary to properly respond, to brief Halter's board of directors and meet with the unsecured creditors committee, Halter's Chief Restructuring Officers and Mr. Shepherd regarding ULYSSES issues.  (Shepherd test., Vol. VI, p. 160:12 – 20.)  Halter claims Andrews & Kurth fees and costs in the amount of $50,235.00.  Heller, Draper, Hayden, Patrick & Horn, counsel representing Halter's unsecured creditors, were also paid for specifically addressing the administrative claims of Felham and Trinity.  (Shepherd test., Vol. VI, p. 167:3 –  24.)

By pre-trial letter (from David Bland dated February 10, 2005), counsel for Halter confirmed that ongoing fees and costs from the Heller Draper and King, LeBlanc and Bland law firms would not be the subject of evidence at trial, but would rather be set post-trial if awarded.  At trial, however, Halter failed to produce attorney's fee bills and cost bills, along with documents supporting payment of such, for the Andrews & Kurth sums, despite the fact that work had long since been completed and concluded.  Halter's counsel stated at trial his impression that the Andrews & Kurth attorney's fees would also be subject to post-trial procedure.  Because of this confusion, as well as Zurich's counsel's assertion that he had not had the opportunity to review any attorney fee bills in order to traverse sums sought by Halter for Andrews & Kurth, Heller Draper, and King LeBlanc, the Court will also refer the fixing of the Andrews & Kurth attorney's fees to the Magistrate Judge.

Glass & Associates, Halter's Chief Restructuring Officers, also had to deal with issues arising out of the ULYSSES claim and it is estimated that they were paid $20,200.00 for their services related to post-fire matters.  (Shepherd test., Vol. VI, pp. 168:6 – 170:8.)

Mr. Shepherd was re-hired by Halter's bankruptcy estate as a consultant for the unsecured creditors committee in April of 2004 to assist them with certain matters, including ULYSSES post-fire issues. (Shepherd test., Vol. VI, pp. 170:11 – 171:5.) Mr. Shepherd billed Halter's bankruptcy estate $42,680. (Shepherd test., Vol. VI, p. 171:6 – 10.)

In total, Halter claims it spent $129,915 in special damages defending and addressing the administrative claims of Felham and Trinity, as a direct consequence of Zurich's failure to pay. Halter additionally requests general damages of $200,000.00 concerning the inconvenience caused by Zurich's failure to pay a claim on which there is admittedly no coverage defense. *Clark, supra*. Halter maintains that this amount should be multiplied by two, pursuant to La. R.S. 22:1220(C), for a penalty of $659,830.00 to be assessed against Zurich.

The Court awards general damages in the amount of $75,000, which the Court believes appropriate under the circumstances herein. Although the Court finds Zurich's conduct in handling this claim to be of sufficient asperity to warrant a penalty, the Court also considers the amount of attorney's fees and costs involved for which Zurich will also be liable. Furthermore, considering that their damages may be doubled as a penalty, an award of $75,000 for general damages appears most appropriate.

## VII.  CONCLUSIONS

### A.  Voiding The Coverage

The Court finds Zurich's *uberrimae fidei* and moral hazard defenses unsupported both in law and fact, and thus rejects any claim by Zurich to void coverage herein. Quite simply, the record fails to demonstrate problems with the vessel that would, in any way, constitute material

misrepresentations or other variances of such a nature that Zurich's coverage would not be applicable.

**B.      Lead/Follow**

Because Zurich is a "following Underwriter," Zurich is bound by the decisions and agreements of the lead London Underwriters, including but not limited to increases in value and claims/settlement agreements. Zurich is therefore bound by the London settlement and owes Felham $1,757,286.45 ($3,274,950.00 less the $1,517,663.55 paid on May 11, 2004) and Halter $231,600.00. Interest from date of judicial demand shall be computed accordingly.

**C.   Zurich's Bad Faith**

Zurich did not abide by its duty of good faith and fair dealing in its investigation, adjustment and attempted settlement of this loss. Zurich did not attempt to adjust this claim fairly or promptly and did not make a reasonable effort to settle this claim with Halter, its named insured.

Zurich failed to tender the undisputed portion of Halter's claim as required by Louisiana law. Zurich received written "satisfactory proof of loss," at the very latest, on May 9, 2003, when it received the second Preliminary Advice of Rivers and Gulf "upon which it made its "offer of settlement" to Halter in the amount of $1,517,663.55. From this date forward, Zurich had 30 days, under La. R.S. 22:658, and 60 days, under La. R.S. 12:1220, to unconditionally tender the undisputed amount of plaintiff's damages. Zurich did not pay the undisputed portion of plaintiffs' damages, $1,517,663.55, until May 11, 2004, almost one year later, which payment was impermissibly subject to certain conditions. Zurich's delay in payment was arbitrary and capricious.

Under Louisiana law, Zurich has clearly acted arbitrarily and capriciously and therefore is liable to Halter for the following: (1) Halter's special compensatory damages[20] pursuant to La. R.S.

---

20.  Halter's special damages are calculated, in part, on the assessment of certain attorney's fees and costs, to be fixed by the Magistrate Judge, and are thus not quantified herein.

22:1220 (A) and (C); (2)  Halter's general compensatory damages of $75,000.00 pursuant to La. R.S.

22:1220 (A) and (C); (3) Halter's attorney's fees and costs pursuant to La. R.S. 22:658(B)(1); and

(4) penalties equal to the greater of $23,160.00 (10% of the amount Zurich failed to pay Halter under

the London settlement), pursuant to La. R.S. 22:658(B)(1), or two times the total amount of Halter's

special and general compensatory damages, pursuant to La. R.S. 22:1220(C).

In addition, pursuant to this Court's Order of August 19, 2004, wherein Zurich's motion to

continue this trial was granted, Zurich shall be responsible to Halter and Felham for attorney's fees

and costs associated with the lately-raised issues of the *uberrimae fidei* and moral hazard defenses.

These attorney's fees and costs shall be fixed by the United States Magistrate Judge Karen Wells

Roby upon appropriate filings of contemporaneous time and cost records.

New Orleans, Louisiana, this  2nd  day of August 2005.

_____
**KURT D. ENGELHARDT**
**United States District Judge**

-61-